1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name    Rosales      Alex    J
          (Last)              (First)            (Initial)

3    Prisoner Number ____ V 76601

4    Institutional Address ____ P.O. Box  409020, Ione, CA.  95640

5

6    ========================================================

7              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

8         Alex  Jesse  Rosales
     (Enter the full name of plaintiff in this action.)

9                         vs.                          )    Case No. _____
                                                       )    (To be provided by the clerk of court)
10       MARTEL, M.                                    )
                                                       )    PETITION FOR A WRIT
11   _____           )    OF HABEAS CORPUS
                                                       )
12   _____           )
                                                       )
13   _____           )
                                                       )
14   (Enter the full name of respondent(s) or jailer in this action)

15

16              Read Comments Carefully Before Filling In

17   When and Where to File

18         You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23         If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS         - 1 -

CV  08  2104

PETITION FOR A WRIT
OF HABEAS CORPUS

E-filing

(PR)

1  <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. <u>INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11        1.  What sentence are you challenging in this petition?

12        (a)      Name and location of court that imposed sentence (for example; Alameda

13                 County Superior Court, Oakland):

14        <u>Santa Clara County Superior Court</u>              <u>San Jose</u>

15        Court                                    Location

16        (b)      Case number, if known _____<u>CC319535</u>_____

17        (c)      Date and terms of sentence <u>March 24, 2005    Life without Parole</u>

18        (d)      Are you now in custody serving this term?  (Custody means being in jail, on

19                 parole or probation, etc.)          Yes <u>XX</u>    No _____

20                 Where?

21                 Name of Institution: ____<u>Mule Creek State Prison</u>____

22                 Address: __<u>4001 Highway 104, PO BOX 409000, Ione, CA 95640</u>__

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  First Degree Murder  PC 187

27  Robbery  PC 211/215.5(c)

28  Carjacking  PC 215

PET. FOR WRIT OF HAB. CORPUS          - 2 -

3. Did you have any of the following?

    Arraignment:                     Yes _XX_    No _____

    Preliminary Hearing:        Yes _XX_    No _____

    Motion to Suppress:         Yes _XX_    No _____

4. How did you plead?

    Guilty _____    Not Guilty _XX_    Nolo Contendere _____

    Any other plea (specify) __NO_____

5. If you went to trial, what kind of trial did you have?

    Jury _XX_    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?    Yes _XX_    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment         Yes _XX_    No _____

    (b)    Preliminary hearing    Yes _XX_    No _____

    (c)    Time of plea         Yes _XX_    No _____

    (d)    Trial               Yes _XX_    No _____

    (e)    Sentencing         Yes _XX_    No _____

    (f)    Appeal            Yes _xx_    No _____

    (g)    Other post-conviction proceeding    Yes _____    No _XX_

8. Did you appeal your conviction?    Yes _XX_    No _____

    (a)    If you did, to what court(s) did you appeal?

    Court of Appeal         Yes _XX_    No _____

    Year: _2006_    Result:__Judgement Affirmed___

    Supreme Court of California    Yes _XX_    No _____

    Year: _2006_    Result:__Review Denied____

    Any other court        Yes _____    No _XX_

    Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                                    Yes _____   No __XX__

(c)   Was there an opinion?                                  Yes _____   No __XX__

(d)   Did you seek permission to file a late appeal under Rule 31(a)?

                                                             Yes __XX__   No_____

If you did, give the name of the court and the result:

The Court Of Appeal - Sixth Appellate District

Relief Granted H028891 July 20,2005

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?              Yes __XX__   No_____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition. You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

U.S.C. §§ 2244(b).]

(a)   If you sought relief in any proceeding other than an appeal, answer the following

      questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: Santa Clara County Superior Court

      Type of Proceeding: Petition for Writ Of Habeas Corpus

      Grounds raised (Be brief but specific):

      a. Conviction is Unconstitutional: Ineffective

      b. Assistance of Counsel; Counsel's performance

      c. deprived right to fair trial (US Constitution,

      d. Amendment(s) V, VI, XIV)

      Result: Denied (SEE PGS. 50-51)  Date of Result: May 8,2007

II.   Name of Court: Court of Appeal-Sixth Appellate District

      Type of Proceeding: Petition for Writ of Habeas Corpus

      Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1  a. Conviction is Unconstitutional: Ineffective Assistance
2  b. of Counsel; Counsel's performance deprived right to
3  c. fair trial (US Constitution, Amendment(s) V, VI, XIV)
4  d.
5  Result: Denied (See pg 52) Date of Result: July 27, 2007

III. Name of Court: The Supreme Court Of California

Type of Proceeding: Petition for Writ of Habeas Corpus

Grounds raised (Be brief but specific):

a. Conviction is Unconstitutional: Ineffective Assistance
b. of Counsel; Counsel's performance deprived right to
c. fair trial (US Constitution, Amendment(s) V, VI, XIV)
d.
Result: Denied (See pg 53) Date of Result: March 26, 2008

IV. Name of Court: NONE

Type of Proceeding: NONE

Grounds raised (Be brief but specific):

a. NONE
b. NONE
c. NONE
d. NONE
Result: NONE Date of Result:

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____ No XX

Name and location of court: NONE

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One: CONVICTION IS CONSTITUTIONALLY UNJUST (USC,A('s) V,VI,XIV); INEFFECTIVE

6   ASSISTANCE OF COUNSEL; C COUNSEL'S PERFORMANCE AT TRIAL DEPRIVED RIGHT TO FAIR TRIAL

7       Supporting Facts:_____

8       _____SEE pgs  1 - 33._____

9   _____

10  _____

11      Claim Two: NONE_____

12  _____

13      Supporting Facts:_____

14  _____

15  _____

16  _____

17      Claim Three: NONE_____

18  _____

19      Supporting Facts:_____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4              See pgs.  3 - 5 _____

5    _____

6    _____

7    Do you have an attorney for this petition?          Yes____    No_XX_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on ___4·11·08_____             _____

14              Date                           Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 7 -

INTRODUCTION TO PETITION
Ineffective assistance of counsel
Counsel's performance at trial deprived my right to receive a fair trial
A violation of U.S. Constitution, Amendment(s) V, VI, XIV

The purpose of this petition is to show that the effective presentation of my defense at trial required the establishment of my credibility before the jury because I was going to testify in my defense.

It is to show that the prosecution intended to present evidence to undermine my credibility and that had to be prevented every time possible.

It is to show that the prosecution did present evidence to undermine my credibility through the presentation of witness testimony. Specifically that of Fedele and Chavez. Where they would implicate me as the driver of the Mazda.

It is to show that counsel entirely failed to test the reliability of those two witnesses before the jury. That his cross examination failed to expose any helpful fact for the defense.

It is to show that these witnesses made prior statements that held indispensable fact regarding their reliability. Fact that would show that one witness' statement evolved from not implicating me at all to completely implicating me but conflicted with state's other evidence and that it was completely cleared up by the time the jury got to hear it. The other witness rendered fact at trial that would prove to be false upon comparison with his prior statement. It is to show that none of these facts were exposed to the jury at trial.

It is to show that the jury was very concerned with getting these witnesses' facts straight that it actually requested a second look at it during deliberations. They wanted their testimony "specific to the Mazda and the location of the person inside it" (CT502A-E) to be read back.

It is to show that counsel did not present any evidence to constitute effective presentation of the defense against the robbery and carjacking charges. It is to show that despite that fact he requested guilty verdict to be returned for the murder charge as a lesser offense to request and hopefully get not guilty verdicts for the robbery and carjacking charges. It is to show that that inquiry was ineffective because counsel's failure to

present the available evidence failed to allow the record to support the jury's ability to honor his request had it chose to.

It is to show that all the evidence needed to effectively present my defense was in counsel's possession prior to trial. That his failure to visit with me and discuss the evidence he had ~~with me~~ failed to allow me to expose its significance to him and how it could possibly aid the defense. That resulted in his failure to present any of the evidence ~~he had~~ at trial.

In short, it is to show that counsels every action leading up to and into trial failed the effective presentation of my defense. That he caused the ineffective cross examination of two key state witnesses. That he caused the absence of any evidence to corroborate my testimony at trial. That his performance altogether deprived my right to receive a fair trial as guaranteed by the U.S Constitution,Amendment VI. And for those reasons,my conviction is Constitutionally unjust and should be overturned by this court.

The final part of this petition is to show that federal review is permitted because the state court's adjudication of my claim is based on an unreasonable determination of the facts in light of the evidence and it is contrary to clearly established federal law, as determined by the Supreme Court of the United States. I believe it is due to misapprehension of the claim. And I respectfully ask this court to hear my claim.

P.S. I wanted to honor the instructions of the application as much as absolute possible so I completely refrained from any legal citations to focus entirely on the facts of my case. Please refer to the pages set aside for all the cases I believe apply. (pgs.3-5) Please do not limit it by my list. I simply do not know of all relevant case law. I did the best I could hoping to make litigation of my claim easier.  Please note that all reference to the symbols (CT) goes to the Clerk's transcripts from trial. And all reference to (RT) goes to the reporter's transcripts at trial.

2

Supporting case law

and

Amendments to the United States Constitution


United States Constitution: Amendments V, VI, and XIV

Alcala v Woodford  334 F.3d 862,883

Brandit v Davis  191 F.3d 887

California v Green  399 U.S. 149,164

Ceja v Stewart  97 F.3d 1246

Davis v Alaska  415 U.S. 308, 94 S.ct. 1105, 1111

Duran v Hopper  161 F.3d 655

Fuller v Roe  182 F.3d 699

Green v Elroy  360 U.S. 474,496

Goldberg v Kelly  397 U.S. 254,269

Hart v Gomez  174 F.3d 1067 ---------------------Harris v Wood  64 F.3d 1432,1438

Hendricks v Calderon 70 F.3d 1032

Johnson v Baldwin  114 F.3d 835

Lily v Virginia  527 U.S. 116

Lisenba v California  314 U.S. 219,236

Lockhart v Fretwell  113 S.ct 838,883,334

Mathews v Eldridge  424 U.S 319,344

Mills v Singletary  161 F.3d 1273

Strickland v Washington 466 U.S 668

Sullivan v Louisiana  113 S.ct 2078

Thomas v Hubbard  273 F.3d 1164,1180

United States v Cronic  466 U.S. 648

United States v Frederick  78 F.3d 1379,1387 ----United States v Thomas 467 F.3d 49

United States v Tucker  716 F.2d 527 ----------Wiggins v Smith  123 S.ct. 2527

Williams v Washington  59 F.3d 673,681-682

Wilson v Henry  185 F.3d 986,987

supporting case law cont...

Hattem v United States   283 F2d 337

United States v Gavdin   115 S.ct 2310,2314-2315

United States v Ndiaye   434 F.3d 1270

United States v Scheffer   118 S.ct 1261

CRANE V. KENTUCKY   476 U.S. 683

CALiForniq V. TROMbeTTa   467 U.S. 479

CRAWFord V. WashiNGTon   541 U.S. 36

4

Supporting case law

for federal review
(Pgs. 34-43)

Avila v Galaza  297 F.3d 911

Bell v Cone  543 U.S. 447

Brown v Payton 544 U.S. 133

Castillo v McFadden 399 F.3d 993

Jackson v Edwards 404 F.3d 612

Mitchell v Esparaza  540 U.S. 12

Nunes v Mueller  350 F.3d 1045

Taylor v Maddox  366 F.3d 992,1000-1001

Peterson v Lampert  319 F.3d 1153

## FACTS UPON WHICH CONVICTION IS BASED

____    1.  On July 10, 2003, Rodney Fedele was riding his bicycle on Williams Street in San Jose.  As he passed Fifth Street he observed a man leaning face-first against the side of a small gold or silver car while a second man went through his pockets.  Based on Fedele's simular experiences, he thought cops were "frisking" the man against the car so he turned around to get a better look.  After he turned around and went down Fifth Street, he stopped at a tree and watched as the guy doing the frisking beat on the other guy being frisked.  He beat the guy with a baseball bat right beside the car.  He hit him at least 10 times all over his body before he fell down. When he did, he hit him at least once or twice more. (RT 98-103)

2.  In the meantime   Fedele observed a third person seated inside the car on the driver's side, behind the steering wheel. And although he could hear talking and yelling, he could not determine if it was "them yelling at eachother" or at "the guy" because he wasn't that close. (RT 99, 103-104)

3.  Fedele left and went down Fourth Street to San Salvador Street. As he began heading towards the 7-Eleven on Sixth Street to call an ambulance, as he was coming up on Fifth Street, he observed the same car he seen earlier making a u-turn at the corner.  It went back up the street to where it was earlier.  Fedele went another half a block and saw a cop coming out of the 7-Eleven.  He told the cop; "hey, somebody is being beat down on the street". The cop followed him back.  Fedele told the cop; "there goes the people there in the car, in the car and this little red truck". (RT 104-109)

4.  Fedele took the cop straight to the body.  The body was laid out in the middle of the road, nowhere near where the beating took place. (RT 105)

5.  Xiao Hong Huang lived in an apartment on Fifth Street with a window that faces the street.  She said that at about 12:35a.m., she was getting ready for bed when she heard a loud banging noise on the street outside. She thought an object was hitting a car so she looked out her window to check on her car.  She saw a bald or short haired guy pick up a baseball bat from the curb on the street.  A silver four-door car traveled for about a half block from San Salvador Street.  Its headlights were on.  It stopped in front, close to the man picking up the bat. (RT 298-304)

6.  Although she could not see the driver, she heard the driver of the car ask the man with the bat if everything was okay. . The man replied that

everything was fine.  The silver car then drove off towards Williams Street.
The man with the bat went into an alleyway.  A few seconds later, she saw a
dark colored truck drive out from the alleyway so she assumed that it was
the man that ran in that got into the truck and drove off.(RT 304-308,313-317)

7.  Huang saw both vehicles travel towards Williams and hit some kind
of bump.  They went slightly upwards.  There was a big "thump noise, like
bump up".  (RT 306-307)

8.  Huang said that she has told this story to several investigative
authorities between the dates of July 10,2003 and January 20,2005.  She said
that her mind was freshest nearer to July 10, 2003.  (RT 308-313,315)

9.  Huang said that she didn't tell anyone about the truck going over
a bump before January 20,2005, that day in court, because she didn't go into
details reguarding the truck in previous statements.  She also said that
even after she found out that the "bump" was in fact a body, she didn't tell
any one before January 20,2005 because she was not asked about it.  She said
she just answered the questions as they are asked.(RT 309-313,317-318)

10.  Natalie Rose Brannon also lived in an apartment on Fifth Street with
a window that faces the street.  At 1:02 a.m. she was standing at her bedroom
window setting her alarm clock.  She heard a struggle, sounds of a physical
altercation, out in front of her apartment.  She    heard someone say "get
away from my car, get away from me".  Brannon became alarmed because she
just moved her car to a parking space in front of the building and was afraid
that it was her car.  She looked out her window and saw that it was not.
However, to her left, she saw a Honda type car parked in a dark spot clearly
out of place.  It was idling with its lights on and the driver's side door
open. It was pointing towards her, towards San Salvador Street.(RT 319-325,328-329)

11. Brannon went into another room to tell her roommate that someone
was being carjacked down stairs and needed help.  Her roommate was very ill
and was lying down so he told her to go back and see if she saw or heard
anything else.  When she did, she saw the same car she had seen earlier but
did not see anything else so she went into the bathroom to brush her teeth.
When she finished, she went back into her bedroom and got into bed when she
heard loud noises out side.  It sounded like a car was driving in circles
directly in front of her apartment.  (RT 321, 325-326,329)

7

12. Although a large tree obstructed her view, Brannon did see a car take off down the street towards San Salvador Street.  It was bigger, possibly red.  At that point Brannon did not see the idling car she had seen earlier because she was distracted by the car taking off and the person lying in the middle of the street. (RT 326-331)

13. Javier Angel Chavez was shown a photograph of Fifth Street and explained that he lived on the right side of the picture and that the top is San Salvador Street.  Chavez lived on the second story of an apartment on Fifth Street.  He said that at about 12:00 to 12:30 a.m. he was watching TV and heard alot of metallic noises, like some thing metallic hitting the ground.  He looked out his window and saw a body lying in the street near a green trash container. He explained that it would be on the left side of the photograph of Fifth Street. (RT 343-347,362-364)

14. Chavez saw a small four-door car traveling with its lights off towards the body in the street.  The car was possibly white.  It stopped about 20 to 25 feet in front of the body on the same side of the street. Chavez said that a person exited the "passenger's" side carrying a baseball bat.  He walked towards the body.  Using the baseball bat, he pushed over the body, "ripped" something from the neck area and, went through the pockets of the pants on the body. (RT 347-353)

15. Chavez saw someone in the white car on the "driver's" side.  He did not get out of the car.  The man carrying the bat walked over to the "driver's" side of the car.  He "dipped down" and appeared to be talking to the driver of the car before he walked to a truck parked in a driveway nearby. (RT 350,354-357)

16. Chavez said that, without changing positions from when it first drove up, the white car ran over the body in the street and dragged it for five car lengths before it backed up over the body again and eventually went towards Reed Street with the truck following. 15 to 20 minutes later, two police cars came. One stopped with the body and one followed the other cars. (RT 356-361)

17. Sergeant Amado Ramirez, a San Jose State University police officer, was on duty at 1 a.m. on July 10, 2003, along with fellow officers, Officer Brad Beavers and Officer Joel Anaya. Sgt. Ramirez said that he was in the

parkinglot of the 7-Eleven store on Sixth Street and San Salvador Street when Rodney Fedele rode up to him on his bicycle and told him that someone was getting beat up with a bat about three streets west of where he was. Sgt. Ramirez immediately went to that direction and at the same time advised dispatch of the type of call he had. Fedele followed behind him to ensure that he made it to the correct location. At first, Sgt. Ramirez passed the correct street, Fifth Street, but could hear Fedele yelling that he went too far. Sgt. Ramirez backed up and went southbound on Fifth Street. He immediately noticed the headlights of a red SUV or a truck with a camper on it in his lane. It was backing away quickly, as if leaving in a hurry, towards Williams Street. (RT 39-46,51-53)

18. Sgt. Ramirez requested his officers to come to his aid, Officer Beavers came fist. He immediately told him to try and catch up to a red vehicle that just went westbound on Williams Street and try to do a vehicle stop on the vehicle. (RT 44,46-48)

19. With a spotlight, looking from side to side, Sgt. Ramirez saw a male subject laying face down mid block of Fifth Street. He got out of his vehicle to check on him. When he did, he noticed that he had a series of visible injuries and blood coming out from his head. He checked his vitals and called out to him. The male subject was unresponsive so. Sgt. Ramirez summoned the Fire Department and an ambulance. (RT 46,48-51)

20. The man in the street was later identified as Jose Luis Ramirez, DOB 8/25/1962. (RT 55)

21. Sgt. Ramirez said that although there may have been a second vehicle on the street that attracted his attention, other than the truck previously described to the Court, his main focus was on the red truck so he specifically told the other officers working with him to follow the red truck. (RT 54-55).

22. Officer Bradley Beavers was at the 7-Eleven on Sixth Street. At 1 a.m. he was inside the store grabbing a snack when an unknown male, not Fedele, opened the door and said to him that someone was getting beat up with a bat. He went out to his patrol car and noticed that Sgt. Ramirez was going in the direction that was pointed out to him. He noticed Fedele sitting at the corner of San Salvador Street and Fifth Street pointing in the direction of Fifth Street. Sgt. Ramirez led the way down Fifth Street

9

when Officer Beavers noticed a man laying face down in the middle of the street. Sgt. Ramirez stopped at the man and said over the radio that he saw the suspect vehicle or, a vehicle matching the description, going south-bound on Fifth Street and turning westbound on Williams Street. (RT 110-113)

23. Once Officer Beavers got on Williams Street, he noticed two vehicles, a Toyota Tacoma truck and a Mazda compact car, at the stoplight of Williams Street and Fourth Street. He then asked, to confirm with, Sgt Ramirez for the description of the suspect vehicle. Sgt. Ramirez told him that it was a red SUV type vehicle. From a distance, the vehicle in front of him, a Toyota Tacoma truck with a camper shell, did indicate an SUV. (RT 113-115)

24. The light turned green and Officer Beavers turned on his emergency lights. All three vehicles, the patrol car, the Toyota and, the Mazda, continued westbound on Williams Street. They stopped at the light on Third Street. Officer Beavers was not sure if they stopped for his lights or the traffic light, so he exited his patrol car. The vehicles turned northbound onto Third Street. Traveling below the speed limit, at 25 MPH the vehicles turned eastbound onto San Carlos Street. As they turned their tires were screeching. The vehicles speed increased to 30 to 35 MPH. They turned southbound onto Fourth Street where Officer Anaya joined the pursuit and stopped in the middle of the street. After passing Officer Anaya, the speed increased to 45 to 55 MPH as they approached the 280 freeway. On the freeway, the speed increased to 65 MPH. They continued towards the 87 entrance. Officer Beavers dispatched that he believed the Mazda was involved. They left the freeway through the Alma exit and proceded right on Lelong Street. Officer Beavers got in front of the Toyota and read the plate off of the Mazda. It was 4SGV995. They continued to Willow Street where Officer Beavers began driving beside the Mazda to make his presence known to the driver in an attempt to get it to stop. He could not tell any thing about the driver other than that there was one. The speed increased to 60 to 65 MPH in a residential, 25 MPH, area. The Mazda sped up to in excess of 90 MPH and Officer Beavers lost sight of it.(RT 116-122)

25. The Toyota truck was eventually stopped at the area of Goodyear and Plumb, still in San Jose. The driver exited the vehicle with his hands up and at gun point. He was ordered to the ground but did not comply so Officer Anaya grabbed him, took him down and, placed him into custody. Officer Beavers noticed that the driver had blood on him. (RT 122-124)

10

26. Officer Beavers eventually searched the Toyota and located a bat in the front cab area of the vehicle. He took a Poloroid photo of the cab to preserve or memorialize the placement of the bat as he saw it. People's exibits #6 and #7 depict the placement of the bat. (RT 124-127)

27. Officer Beavers identified Defendant Pineda as the driver of the Toyota truck. (RT 123)

28. Joel Jesse Anaya, a Salinas City Police officer, was previously employed by the San Jose State University Police Department and was on duty on July 10,2003. At 1 a.m. he was in the area of Eleventh Street and Keyes when he overheard Sgt. Ramirez's dispatched information that he needed Fire and AMR assistance for a victim lying in the street of Fifth Street and San Salvador Street. He also overheard that Officer Beavers may have a suspect vehicle in front of him on Fourth and Williams. (RT 56-58)

29. Officer Anaya went to assist Officer Beavers in the vehicle stop and eventually ended up traveling in the wrong direction on Fourth Street. Fourth Street is a one way southbound street. Officer Anaya observed Officer Beavers' patrol car behind a red SUV that was behind a silver Mazda sedan headed in his direction on Fourth Street. He positioned himself on the driver side of the Mazda and exited his vehicle with his firearm out. He approached the Mazda and yelled at the driver of the Mazda to stop out of concern for his own personal safety. He observed the red SUV in between the Mazda and the patrol car. According to Sgt. Ramirez's traffic over the radio, only the red SUV was involved with the victim being down on Fifth Street and needed to be stopped so he waved the Mazda to move along. The driver, a young hispanic male with black hair and fair skin was alone in the Mazda.(RT 58-65)

30. After the Mazda was waved by, the red SUV followed and both officers resumed persuit of it. They went to the I-280 then got onto the I-87. Each time the Mazda would change lanes the red SUV would also. They exited the freeway at the same time. This led the officers to believe that the Mazda was leading the red SUV in the persuit. Officer Beavers got in between the the two vehicles at that point and read the liscence plate over the air. (RT65-67)

31. Although the persuit began slow it led up to speeds of 90 MPH where the Mazda ran through stoplights and the officers lost sight of it. They continued to remain behind the red SUV and eventually stopped it at Goodyear and First Street. They exited their vehicles and placed the driver into custody. He was later identified as the Defendant Sergio Timmothy Pineda. (RT 67-72)

11

32.  The Toyota's liscense plate read 6U05976 and was registered to
its owner, Jose Luis Ramirez.  The persuit lasted approximately 3½ minutes.
At the end, Officer Anaya asked Pineda if he knew who was driving the Mazda.
Pineda responded that "He didn't have anything to do with this.  I did what
I did for my own reason.  I was the only one involved.  And I know my rights
and that's all I'm going to say to you.". (RT 72-76,91-92,95-96)

33.  Richard Benitez, a San Jose City Police Officer, was on duty July
10, 2003.  At 1:08 a.m. he was parked in his patrol car along the east curb
line of First Street, near the Willow Street intersection when he heard a
vehicle traveling at a fast speed approaching.  A small silver car stopped
at the intersection.  It was driven by a hispanic male in his twenties with
medium-toned skin and dark hair.  He was alone in the car.  He looked at
Officer Benitez and appeared to be suprised to see the officer.  The driver
turned southbound onto First Street. (RT 155-157,159)

34.  Officer Benitez then heard police sirens in the distance and became
concerned so  he waited there rather than pull over the driver in the silver
car.  He then noticed that the sirens were approaching his location from
Willow Street.  A red pickup truck approached and then turned southbound
onto First Street in obvious persuit by two San Jose State Police Department
patrol cars.  Officer Benitez joined the persuit.  By the time he caught
up to the patrol cars they had everything under control so he just stood
by. (RT 157-158)

35.  San Jose Officer Jaymes McBrayer was responsible for processing
Pineda after he was taken into custody. (RT 163-164)  McBrayer noticed that
there were possible bloodstains on Pineda's left sleeve, left pant leg, and
on his hands. (RT 166-167,169-170,173)  McBrayer took samples of the blood
on Pineda's hands. (RT 171)  He also took his clothing which consisted of
a pair of men's blue jeans and a New Jersey Devils jersey. (RT 172)  In spea-
king with Pineda, McBrayer did not believe that he was under the influence
of alcohol. (RT 175)

36.  Sometime after midnight, Pineda Sr. was awakened by a telephone
call.(RT 140) A female voice he did not recognize said to "call Chucky's
phone." (RT 138) Pineda,Jr.'s nickname was Chucky. (RT 138) Pineda,Sr. made
the call, which was answered by Petitioner. (RT 142-143) Petitioner sounded
very excited and nervous, and told Pineda, Sr. that the police were chasing
his son and that he himself was lost. (RT 143-144,146,149)  Petitioner did

not say that he also was being chased by the police. (RT 147) He did say
that he was at the Double Tree Hotel off of Highway 101. (RT 148) Pineda,
Sr. gave Petitioner directions back to his house, and also told him to just
park the car, and Pineda, Sr. would recover it the next day. (RT 147) Petiti-
oner agreed to do so. (RT 148) Pineda, Sr. asked petitioner what was going
on, and Petitioner told him there had been "some type of robbery" and "an
altercation with another man." (RT 150-151) Pineda, Sr. was never actually
told that anyone had been hurt or killed. (RT 153-154) Pineda, Sr. went
back to sleep. (RT 148)

37. At about 1:10 a.m., Petitioner called his mother Gloria Rosales.
(RT 181) [To avoid any confusion with Petitioner, Gloria Rosales will be
refered to as "Gloria."] Gloria thought he sounded like he was going to
cry and he said "I'm scared. I'm confused. I dont know what to do. Will you
please come and pick me up?" (RT 181,192) He further told her that Chucky,
whom she knew to be Pineda, had just beat somebody with a bat. (RT 181-182,193)
He explained that the beating had resulted from "a road rage" (RT 193) Gloria
did not remember Petitioner telling her that Pineda had also taken the man's
truck, though she had testified to that at the preliminary examination. (RT 182-
183)

38. Gloria left her home in Modesto at about 1:30 a.m. (RT 194) She
picked Petitioner up in San Jose at 3:00 or 3:30 a.m. (RT 195) He was in
pain due to a broken foot he had suffered about two weeks before the incident,
and which was still in a cast requiring him to use crutches. (RT 199-200)
He had been scheduled for surgery. (RT 200) He was crying and fell asleep
on the way home. (RT 195)

39. At approximately 7:00 a.m., about 10 police officers came to Pineda,
Sr.'s door. (RT 148)  he was taken to the police station where he told Detec-
tive Millard that he knew where the silver Mazda could be found. (RT 148-
149) Later in the day, Petitioner was located at his home by San Jose Police.
(RT 406) He was asked to accompany them down to the San Jose Police Department
for an interview. He agreed and was interviewed by homicide detective Robert
Millard and Officer Ed Bettencourt. (RT 238,406) He initially told them
that he had stayed home that evening, but then said that he had been downtown
San Jose when he was approached by Ramirez, who was drunk. (RT 407-408)
Petitioner said that he was the passenger in a silver Mazda when Ramirez
was told that there was a party at a nearby location. (RT408) He further

13

told them that at some point, he climbed over the center console into the driver's seat to drive the car away, and that as he did so, he ran over Ramirez. (RT 409)  He dragged Ramirez for some distance, then reversed the car in an effort to get the car off of Ramirez, instead driving over Ramirez again. (RT 409)  Petitioner further told them that he saw officers arriving, and he fled because he was on probation. (RT 410)  He related that he had called Pineda's father who told him to get rid of the car and go home, so he had abandoned the car at the Double Tree Hotel. (RT 410)  He admitted that when he had left the scene of the crime, he knew that Ramirez's cell phone was in the car.  It was "discarded" into a trash can. (RT 238,240,411)  He then called his mother to pick him up. (RT 411)

40.  Petitioner accompanied Officers to the Double Tree Hotel and showed them where he had disposed of the cell phone.  However, because the trash can had been emptied earlier by janitorial services, it was not found and never recovered. (RT 241-242)  Bettencourt allowed Petitioner to speak to his mother. (RT 242)  Crying Petitioner apologized for lying to her, saying that there had been no road rage incident, but that there had been a robbery although Petitioner did not participate. (RT 196-199,242-243)

41.  The crime scene was processed by San Jose Police Officer Mark Conrad. (RT 248)  Fifth Street is a student housing residential area south of San Jose State University, bordered at the north end by San Salvador and at the south end by Williams Street. (RT 251,253)

42.  Conrad was briefed by his commanding officers based on statements gathered from witnesses and was able to support the statements by going in and seeing the physical evidence. (RT 253)  He found a pattern of blood and shreds of clothing in the southbound lane that he believed to be where Ramirez had been assulted, lost a large amount of blood as a result of the assult, and was then run over by a vehicle and dragged from north to south along the asphalt for a distance of about 118 feet. (RT 257-267)  Conrad examined the inside of Ramirez's toyota tacoma pick-up in which he saw both a baseball bat and a hollow galvanized metal pipe. (RT 269)  There was blood on the bat. (RT 271)  An examination of Pineda's Mazda in a steril environment with the proper detecting equiptment, lighting, chemicals and cameras revealed blood in the interior passenger side and on the front portion of the under-carriage. (RT 272-274,290-291)  He also saw blood on the fenders and wheel well area that he theorized to have resulted from the vehicle driving through blood and casting it off of the tires. (RT 274-276)  Inside the Mazda, Conrad

14

saw blood on the center console, which he opined could have gotten there
when someone wearing bloody clothes sat in the passenger seat and brushed
his knee against the console. (RT 277)  He agreed that the bloody bat could
also have transfered the blood. (RT 286-287)  A comparison of the actual
placement of the bat inside the Toyota and the blood found inside the Mazda
depicts such a possibility that the bloody bat was responsible for the blood
transfer inside the Mazda. (RT 287)  Based on the blood evidence on the ext-
erior of the Mazda, Conrad believed that it was the vehicle that had struck
Ramirez and pushed him for 118 feet on the ground. (RT 276)

43.  On the front seat of the Mazda, Conrad found a Timex Indiglo wrist-
watch with a torn wristband that appears to have been "ripped" off a person's
wrist, which belonged to Ramirez. (RT 278-280,297,297) and a black plastic
holder for  a motorola cell phone. (RT 281)  A Nokia cell phone was found
in the center console as well as a black leather case for a flip cell phone.
(RT 281-282)  The Nokia displayed a message containig Petitioner's nickname
"Happy", and did not match the Motorola holder. (RT 282)  Also inside the
Mazda was a credit card issued to Jose L. Ramirez. (RT 282-284)  A thorough
search of the scene, the Mazda and, the Toyota turned up no trace of a neck-
lace. (RT 294-297)

44.  Conrad collected blood samples from Pineda's hands. (RT 296)  DNA
testing revealed that the blood on the undercarriage of the car was that of
Ramirez (RT 385), as was the blood on the baseball bat (RT 389), the blood
on the wristwatch (RT 392), and the blood on the console of the Mazda (RT
392). The blood on Pineda's hands could have been either Ramirez's or Pineda's.
(RT 394-396)

45.  Doctor Joseph O'Hara, a forensic pathologist for the Santa Clara
County Coroner's Office reviewed the autopsy performed by Doctor Diane Vertes
on Jose Luise Ramirez. (RT 206-208)  He agreed with her conclusion that
Ramirez's death was a result of multiple blunt force injuries, more specific-
ally, he said that it was "crushing injuries" to the chest. (RT 208,231-232)
O'hara explained that there were three broken ribs (RT 209) at the latteral
aspect of the right side of Ramirez's rib cage, four ribs up from the bottom,
on the side of the right side of the torso. (RT 226)  One punctured the right
lung. A lasceration of the right ventrical of the heart and the liver was
also noted. (RT 209)  This constellation of injuries are frequently refered
to as "crush" type injuries but are generically described as "blunt force"

15

injuries. (RT 226-227)  O'Hara explained that a vehicle running over the
body could have caused these "crush" injuries (RT 209-210)but, also believed
that being struck by a baseball bat or being kicked, with enough force, could
have caused these injuries to the rib cage. (RT 227-226)

46.  Although O'Hara could not locate any unique injuries on the body
to point specifically to a car as being the mechanism of the trauma to the
rib cage (RT 210,227) he believed he could make that inference based on his
knowledge that a car is involved in this case. (RT 228)  Accordingly, he
stated that the constellation of injuries in the chest are typically seen
to be caused, not by a car per se, but by some sort of heavy object heavier
than a human body. (RT 228)

47.  O'Hara located multiple injuries on Ramirez's body charecteristic
with being struck by a baseball bat. (RT 215-223)  Specifically, he noted
abraded linear lascerations and contusions on the head and face. (RT 215,218-
219,223)  Contusions on the torso, one on the left shoulder, one on the latteral
right side of the mid back, a very simular one a few inches below,and three
on the right side of the back. (RT 215-216)  Some were lacerated. some were
not. (RT 215)  They were all described as being caused by blunt force impacts
by a "long tree branch or a baseball bat". (RT 215,217,219) He further descr-
ibed these injuries as being caused by a "long heavy object"(RT 217) and
that mass X force would constitute "heavy" in this case. (RT 221-222) The
baseball bat taken from Ramirez's truck was consistant with the size and
shape of the object that may have caused the injuries. (RT 126,221,269,271)

48.  In addition to the crush injuries, O'Hara observed large abrasions
which occur when skin is dragged across pavement. (RT 210-213)  Ramirez also
appeared to have thermal injuries on his hands and right hip. (RT 214)  O'Hara
opined that these occured where his body came into contact with the hot under-
carriage of the car or the exhaust system. (RT 214)

49.  O'Hara noted that there were no fractures of the skull or facial
bones. (RT 222)  Ramirez had sustained no potentially lethal injury to the
brain or head as a result of being hit with the baseball bat, leading O'hara
to believe that being hit with the baseball bat did not cause Ramirez's death.
(RT 223,233-234)  He explained that skull fractures are typically caused
by things like hammers where alot of mass is concentrated into a very small
area. (RT 222-223)

50.  O'Hara stated that he was unable to form an opinion,,and believed

16

it was impossible to do so, regaurding whether Ramirez was still alive when his chest was crushed because the totality of the injuries were sustained too close in time. (RT 224-225)

51. O'Hara believed that Ramirez's injuries were consistant with a hypothetical scenario in which a person was struck eight to 10 times with a bat, fell to the ground, was hit by a car, dragged for a distance of 120 feet and, actually backed over by the same car in an attempt to disengsge him. (RT 225)

52. The prosecutor's theory was that petitioner and Pineda were in agreement from the very beginning that they were going to commit a robbery together. (RT 622) He argued that from the very beginning, petitioner was acting as the getaway driver. (RT 632) He argued in the alternative however, that even if the jury believed petitioner's testimony that he only drove the car away from the scene after Pineda had returned to the scene and gotten out to get more loot, petitioner was still guilty as an aider and abettor. He argued it was clear that petitioner knew there was stolen property in the car as he fled. (RT 633-634) The prosecution argued that Pineda obviously knew that petitioner was going to drive the Mazda away from the scene while Pineda took Ramirez's truck. (RT 640) Thus, even if petitioner did not take the wheel until after the return to the scene, the jury should find that he had aided and abetted Pineda in the robbery and carjacking.

53. The Defense Case

54. Approximately two weeks before Ramierz's death, Petitioner broke his right ankle in three places. (RT 417) His leg was in a cast and was using crutches on July 10,2003. (RT 418) Vicodin had been prescribed for pain.(RT 418)

54. On the morning of July 9, Pineda, whom he had known six to eight years and whom he considered almost a brother(RT456), came to petitioner's home and asked him to accompany him back to San Jose. (RT 419) Petitioner did not want to go, as he was on crutches and needed help getting around. (RT 419) Nevertheless, he reluctantly agreed to go. He had his prescription filled and the two left for San Jose around 2:30 or 3:00 p.m. (RT 421)

55. Upon arrival in San Jose, the two went to Pineda's father's house. (RT 422,519) Pineda and his father were drinking alcohol while petitioner smoked pot which he had been doing since early morning. (RT 422) At about

17

8:30 or 10:00 that night Pineda and petitioner went out, visiting several
bars. (RT 424-426,256) They decided to get some food, but at an intersection,
an intoxicated Ramirez approached the car. (RT 427-428,456-457) He was about
to to shake hands with petitioner when Pineda turned the corner. (RT 427-
428,457) After turning the corner, Pineda said "This guy is really drunk,
I'm going to rob him." (RT 428,457,461) Petitioner told him not to, as he
was on probation and did not want to get in trouble. (RT 428-429,461-462)
Petitioner believed that Pineda was not really going to do anything. (RT
430,462,464)

    56.  Pineda pulled up to where Ramirez was walking, told him there
was a party nearby, and invited him to attend. (RT 430-431,463-465,468,482)
Although petitioner heard their conversation, he did not join in and was
not paying attention as he was in the process of rolling a joint, which he
continued to do rather than encourage or participate in what was happening.
(RT 466,470) It never occured to petitioner to warn Ramirez. (RT 431)

    57.  Ramirez followed Pineda and petitioner in his truck. (RT 431)
As they drove, petitioner and Pineda did not have any conversation at all.
(RT 482-483) Pineda directed Ramirez to park his truck in an alley. (RT 431,483)
By this time, petitioner knew that Pineda was in fact going to rob Ramirez,
but thought if he said nothing and did not participate, he would not be invo-
lved. (RT 464,469-470) Pineda parked the Mazda in the lane and got out of
the car when Ramirez approached. (RT 432,487) The headlights were off and
the engine was still running. (RT 486) Petitioner continued rolling the joint
and was not paying attention to what they were doing. (RT 466-468) Pineda
and Ramirez talked beside the rear of the car when suddenly the back door
opened, and then petitioner heard a thump. (RT 432) Not knowing what it was,
he looked back and saw Pineda hitting Ramirez with a baseball bat, hitting
him perhaps eight or 10 times in the head and body. (RT 432,489,491,493)

    58.  Petitioner began yelling at Pineda to stop and telling him to
leave Ramirez alone, but did not get out of the car to help Ramirez, thinking
that if he was not involved, he would not be responsible for anything. (RT
433,490-491) He prayed. (RT 491-493) after a few seconds, petitioner looked
back again and saw Pineda looking through Ramirez's pockets. (RT 434,494-
495) Pineda then got in the driver's seat of the Mazda, put the bat against
the console and turned the car around. (RT 434,495-496) Petitioner was scared
and just wanted to get away, so it did not occur to him to help Ramirez.
(RT 435)

18

59.  Pineda pulled into the intersection, turned the light on, and looked at the items he had taken from Ramirez. (RT 436)  He said "I didn't get no money. All I got was papers." (RT 436,496-497) Petioner said nothing. (RT 436-437) Pineda then made a u-turn and returned to where Ramirez was lying, parking right next to his body. (RT 437,503-505) Petitioner did not know that Pineda intended to take Ramirez's truck. (RT 507-509) He got out of the car, and petitioner immediately got into the driver's seat, put the car in drive, and stepped on the gas, hitting Ramirez. (RT 437-439,509) He did not know that any of Ramirez's property was in the car. (RT 500-501) He did not know that Ramirez was lying in the street in front of the car because the beating had been administered by Pineda in the back of the car. (RT 510-511)

60.  Petitioner was in a panic. (RT 440-441) He wanted to stop, but he saw police car lights and he left because he didn't want to go to jail. (RT 441-442) He did not know where he was or where he was going.(RT 441) Pineda was driving behind him in Ramirez's truck flashing the high beams. (RT 442) Eventually he noticed that the police were no longer following him. (RT 442-443)

61.  Petitioner called his mother and asked her to come pick him up. (RT 443) He told her that the incident had arisen from a road rage scenario. (RT 458-459) He also called Pineda's father and told him that they had hit somebody. (RT 459) Pineda's father told him to get rid of the car. (RT 443) Petitioner parked the car in the parking lot of the Double Tree Hotel, took his belongings out of the car, and left on foot.

62.  Feeling light-headed and fearing he was going to pass out, petitioner sat down. (RT 444-445) The cell phone rang in his pocket while he was on the telephone with his mother. (RT 445) He took the phone out of his pocket and saw that it was Pineda's phone. (RT 445) Looking at the phone he was using, he realized that it was not his phone but Ramirez's and immediately hung up. (RT 445,499) He threw Ramirez's phone in the garbage can because it was not supposed to be in his possesion. (RT 444-445,500)

63.  Petitioner waited an hour or two for his mother to pick him up. He had no idea what had happened to Pineda. (RT 446) When his mother arrived, he got in the car crying, but told her nothing about what had happened. (RT 447) He fell asleep in the car on the way back to Modesto. (RT 447)

64.  When police officers arrived at petitioner's house that afternoon, he was not suprised. (RT 448) He voluntarily accompanied them back to San Jose, and was interviewed by Millard and Bettencourt. (RT 449) Initally, petitioner lied to them, hoping to talk his way out of it, but when they told him that Ramirez had died, he decided to tell them the truth. (RT 449-450,459-461) Petitioner was extremely distraught and remorseful. He tried to write a letter to Ramirez's family expressing these emotions, but could not think straight. (RT 450-451) Petitioner had never wanted to rob Ramirez. He had not wanted his money, cell phone, keys, truck, or credit cards. However, it never occured to him to oppose Pineda. (RT 451)

## I.    My conviction is Constitutionally unjust:

### Ineffective assistance of counsel

COUNSEL'S PERFORMANCE AT TRIAL DEPRIVED MY RIGHT TO A FAIR TRIAL
A violation of U.S. Constitution, Amendment(s) V, VI, XIV

a.  Counsel's Failure to cross examine witness Fedele reguarding his
    prior statements deprived my right to effective cross examination
    because it failed to expose invaluable facts to the jury.

Prior to trial, Fedele made a statement to Sgt.Ramirez immediately
after the crime.  This statement did not include a Mazda or a driver. (see
page 44 of this petition)

Fedele testified at a conditional examination. (CT322-361)

Counsel did not cross examine Fedele reguarding these statements at
trial. (RT108-109)

Had he cross examined Fedele reguarding these statements at trial certain
facts could have been exposed to the jury:

1. Fedele testified that after he returned to Fifth Street with
   Sgt.Ramirez he saw a silver car make a u-turn at the same
   place and time as the officer. (CT12-13,19-20,31-32)

2. Fedele testified that he pointed out the silver car to
   Sgt.Ramirez as being the one involved. (CT13,16,19-20)

3. Fedele was asked to position the person he said he saw inside
   the silver car according to his actual observations and his left
   or right.  He positioned the person twice at his left before
   changing it to twice at his right. (CT23-24)

4. Fedele was shown a photograph of the Mazda in this case. He
   did not recognize it. (CT18-20)

5. His initial statement did not include the silver car or a
   driver.

These facts at trial could have shown the jury that Fedele's statements
evolved over a period of fourteen months from not including the Mazda and
a driver to including it at the conditional examination but conflicting with
the state's other evidence then being inconsistantly removed by the time

21

he testified at trial.

The testimony at the conditional examination that he observed the silver car (Mazda from here on out) and Sgt.Ramirez at the same time and location would have put two officers immediately behind the vehicle Chavez observed traveling from that direction after he saw Ramirez lying in the street already. (RT347) Had that actually occured, according to Chavez, the officers would have witnessed Pineda exit the Mazda to approach Ramirez in the street and return to the Mazda before he went to take the truck.(349)  They would have also witnessed the car hit Ramirez, or possibly prevented it. (RT349)  Except neither officers testified to such a thing. Moreover, Chavez's testimony was that the officers arrived several minutes later.(RT360-361)

At trial, however, Fedele testified that he seen the Mazda make a u-turn before he flagged down Sgt.Ramirez. He said he had to go another block and a half before he located him. (RT106-109) His testimony now leaves a window of opportunity between him seeing the Mazda making a u-turn and it returning to Ramirez's location as Chavez said. Thus the confliction was inconsistently removed by the time he testified for the jury.

Fedele's testimony at the conditional examination that he actually pointed out the Mazda's involvement to the crime is conflicting with Sgt. Ramirez's and Officer Anaya's testimony.  Sgt.Ramirez said that he was not suspicious of the Mazda's presence at the scene when he arrived. He said for that reason he specifically ordered Officer Beavers to stop the red SUV. (RT54-55)  Officer Anaya actually stopped the Mazda but then let it go because the raido traffic from Sgt.Ramirez was that only the red SUV was involved with the victim down on Fifth Street.(RT63)

Again, at trial, this confliction was removed. Fedele said that he told Sgt.Ramirez of two vehicles' involvement. The Mazda and a "little red truck". (RT108) Now leaving the possibility that,although he told the officer of the Mazda's involvement, he chose to persue the red SUV versus the Mazda for his own reasons.

These facts, including the positioning of the person inside the Mazda, the failed id. Of the Mazda itself, and Fedele's initial statement that does not include the Mazda or a driver, needed jury exposure. It could have

22

included it in determining Fedele's reliability and how much weight he should be given in its conclusion of the trial.

Counsel's actual cross examination of Fedele at trial failed to expose these facts to the jury. (RT108-109) Counsel's failure was completely unreasonable in light of the circumstances of this case.

His actual cross examination not only failed to expose these facts. It failed to expose any useful facts to the defense.

The facts that could have been exposed to the jury goes to the heart of this case. They are specific to the Mazda and a driver.

The defense theory rested upon my testimony at trial. My credibility before the jury was immeasurable to its success. Fedele's testimony specific to the Mazda and a driver untested completely undermines my credibility.

Counsel's strategic decision was to challenge State's evidence where it would implicate guilt in the robbery and carjacking charges. (RT618-633, 747-749) Fedele's testimony specific to the Mazda and a driver implicates guilt in the robbery and carjacking.

Despite his own belief in the evidence to contest it altogether, Counsel decided to request "Guilty" verdict for the murder charge as a lesser offense to request and recieve "Not Guilty" verdicts for the robbery and carjacking charges. This request was unreasonable because it could not be supported by the evidence. Fedele's testimony specific to the Mazda and a driver implicates guilt as long as it remained untested as it did. (RT694-695)

Counsel's strategic decision was to argue to the jury that Fedele's testimony specific to the Mazda and a driver was unreliable. He said that he was mistaken and wrong in his observations.(RT660,666,697-698,713) That was unreasonable. There was no record to support it.

The jury requested Fedele's testimony "specific to the Mazda and the location of the person inside the car". (CT502A-502E) That would prove to be pointless. There was nothing to support the defense. Counsel's actual cross examination of the witness left Fedele's testimony completely unchall-enged. So the jury was forced to return a guilty verdict immediately after, as it did. Had they actually had the facts spelled out in this petition

23

from Fedele's prior statements to aid in its determinations there is no saying what they would have chose. They apparently wished for something to be there.

In short, I believe the proper functioning of the adversarial testing process in my case demanded that the jury be exposed to every fact available from Fedele reguarding his reliability specific to the Mazda and a driver. So that it could adequately determine the weight to be given him in its final conclusion. But Counsel's actual crossexamination of him failed to expose any of the available facts. It didn't expose any useful facts. It just left Fedele's statement as it was. It failed the testing process.

It is for all these reasons that I believe counsel's failure to cross examine Fedele reguarding his prior statements at trial was un reasonable. I believe it failed my actual defense. I believe it deprived my right to have effective cross examination of the witness.

Therefore, I allege, Counsel's failure to cross examine Fedele reguarding his prior statements, that failed to expose the facts spelled out in this petition to the jury, was completely unreasonable in light of the circumstances of my case. It failed my defense and it deprived my right to effective cross examination.

b. Counsel's failure to cross examine witness Chavez reguarding his ability to distinguish between the passenger side of the Mazda and the driver's side deprived my right to effective crossexamination because it failed to expose invaluable fact to the jury reguarding his reliability.

Chavez testified at the preliminary hearing. (CT23-44)  His testimony was that he was observing the "passenger side" of the Mazda "first-hand" from his apartment window. (CT36)

Counsel's actual cross examination of this witness failed to expose this fact to the jury at trial.(rT362-366)

Had Counsel exposed this fact to the jury it would have shown that Chavez was wrong in his observation. That Chavez was mistaken to say that he seen

24

the "passenger" exit the Mazda.

Exibits 1-3 at the back of this petition (pgs.45-47) will help to illistrate the point. The facts of this case shows that Chavez resided on the east side of Fifth Street. That the Mazda was facing front-end-south. That the Mazda was always facing the same way throughout Chavez's observations. From the time it drove up through to when it fled the scene. In other words, the facts show that the side of the Mazda always facing towards Chavez's apartment building (east) was the driver's side. (People's exibits 22-25,34 Defendant's exibits 101-102, RT251-267,272-276,287-291,354-357,629)

On these facts, Chavez's testimony at the preliminary hearing that he believed he was observing the "passenger side" of the Mazda "first-hand" was wrong. The driver's side was factually facing his apartment building.

Also on these facts, his testimony that he obsreved the person exit the Mazda from the passenger side was wrong. His belief that the passenger's side of the car is facing his window indicates that the person is exiting from the side of the car facing towards his window. That is factually the driver's side of the car.

Therefore, Chavez was mistaken to say that he actually observed the passenger exit the Mazda.

This fact needed to have been exposed to the jury. It could have included it in its determination of Chavez's reliability and how much weight to be given to him in its verdict.

Counsel's actual cross examination of Chavez failed to expose this fact to the jury at trial. (RT362-366) This failure was completely unreasonable in light of the circumstances of this case.

His actual cross examination not only failed to expose this fact. It failed to expose any useful facts.

This fact, had it been exposed, could have gone to the heart of the case. It was specific to the Mazda and a driver.

Chavez was a key prosecution witness. His testimony specific to the Mazda and a driver contradicts the defense theory.

The defense theory rested upon my testimony. It rendered my credibility immeasurable to the success of the defense. Chavez's testimony specific to

25

the Mazda and a driver(untested) completely undermines my credibility before
the jury.

Counsel's strategic decision was to challenge State's evidence where
it would implicate guilt in the robbery and carjacking charges. (RT618-633,
747-749) Chavez's testimony specific to the mazda and a driver implicates
guilt in robbery and carjacking.

Despite his own belief in the evidence to contest it altogether, Counsel
decided to request a "Guilty" verdict for the murder charge as a lesser offense
to request and recieve "Not Guilty" verdicts for the robbery and carjacking
charges. This request was unreasonable because it could not be supported
by the evidence. Chavez's testimony specific to the Mazda and a driver
implicates guilt so long as it remained untested. It did. (RT694-695)

Counsel's strategic decision was to argue to the jury that Chavez's
testimony specific to the Mazda and a driver was unreliable. He said that he
was mistaken and wrong in his observations. (RT660,666,697-698,713) That
was completely unreasonable. There was nothing on record to support it.

The jury requested Chavez's testimony "specific to the Mazda and the
location of the person inside the car". (CT502A-502E) That would prove to
be pointless. There was nothing to support the defense. Counsel's actual
cross examination of the witness failed to elicit fact favorable to the defense.
It made it so that they were forced to return a guilty verdict no matter
how much it wanted to do otherwise. Had they actually had Chavez's testimony
that shows he was mistaken in his observation reguarding the side of the
Mazda he was seeing first hand from his window. there's no telling which way
it would have gone.

In short, I believe that the properfunctioning of the adversarial testing
process in my case absolutely required the jury to be exposed to the fact
that Chavez was mistaken in his observation. Its absense allowed it to reach
a conclusion on less than all the facts available, but most importantly,
it reached its conclusion on faulty fact. That completely undermines any
reliability in its conclusion. Especially in light of the fact that it was
so concerned with getting the facts right reguarding the location of the
person seated inside the Mazda that it took the time to have a second look

26

at the testimony giving it sustenance.  This fact shown to have been omitted goes directly to it.

   It is for this reason that I believe Counsel's failure to cross examine Chavez regarding his ability to distinguish between the sides of the Mazda at trial was ineffective and unreasonable. Perhaps the question could be put differently. Better even. The point is to get to the unexposed fact. Either way, I believe his actual crossexamination of Chavez failed my defense and deprived my right to effective cross examination.

   Therefore, I allege, Counsel's failure to crossexamine Chavez reguarding his ability to distinguish the side of the Mazda, where it failed to expose invaluable fact to the jury to aid in its determination of his reliability, was completely unreasonable in light of the circumstances of this case. It failed my defense and it deprived my right to effective cross examination.

   c.  Counsel's failure to present evidence central to the defense deprived
       my right to present a meaningful defense because it failed to
       corroborate my testimony where it could.

The following evidence could have been presented at trial:

   1.  replica of Ramirez's cellular phone
   2.  replica of Pineda's cellular phone
   3.  complete toll records for Ramirez's cellular phone
       for July 10,2003 (SEE PG 48)
   4.  testimony of Erica Haynes
   5.  vehicle persuit report of Officers Beavers and
       Anaya for the persuit involving the Toyota Tacoma
       truck, liscense 6U05976. (SEE PG 49)

   Counsel did not present any of this evidense at trial. (RT416-452,526) I was the only witness and evidence presented.  Had he presented the above evidence at trial;
                     The cell phone replicas could have shown that both phones

are flip phones and could easily be mistook for the other.

The cell phone records could show that there was a call duration that ended on Ramirez's phone at the precise moment the first incoming call came in on Pineda's phone from his father.

Erica Haynes' testimony could have shown that she was in posession of my functioning cell phone from July 9 to July 10,2003.

The vehicle persuit report could have shown that vehicle code section 14602.1 mandates that all vehicles involved in a persuit be reported on the proper form to the Department of the California Highway Patrol. That the Toyota Tacoma truck was the only vehicle reported by the officers involved in the persuit in this case.

All of this evidence could help to establish credibility to my testimony by corroborating it with facts where it could. The  vehicle persuit report could have helped to corroborate the defense theory. In other words, this evidence is central to the defense. Counsel's failure to present it at trial was unreasonable under the circumstances of this case.

His actual strategic decision was to rely exclusively upon my testimony as the defense. It rendered my credibility before the jury invaluable to its success.

Introduction of the cellular phone evidense (records and replicas) could have prevented the attack the state prosecutor made on my credibility in his closing arguement. He said that I could not be believed because I lied when I said I used Ramirez's cell phone by accident. He said that the records' absence in the trial proved that fact.(RT631,749-750) This attack on my credibility was easilly preventable. The state prosecutor subpeoned all the cellular tele phone records in this case and turned them over to the defense. (CT241-252,255-265,268-278,283,285,299-306,307) My mother went to the public defender's office inquiring into this. They told her that they were unpermitted to turn them over to her but confirmed that they did have a copy of Ramirez's telephone toll records for that day in its file. Threfore, it was completely unreasonable for counsel to fail in presenting it to the jury. Not only would it have corroborated my testimony with fact but it would have prevented the attack made by the state prosecutor.

28

Introduction of the persuit report could have corroborated my testimony that I was not ever involved in the robbery or carjacking. It could have shown that leaving the scene did not help Pineda to escape. The persuit report shows that they didn't consider me to be actually involved in the persuit. Otherwise they would have included the Mazda I was driving in the report. They did not. I could not find a second report for it anywhere in the discovery. This shows that, despite that fact, every thing I did immediately after leaving the scene was to obey their command. I made complete stops at the stop lights and was going under the speed limit. I stopped when ordered to by the officer. (RT114,116,117,63-64)  If they would not have ordered me to procced foward, as they did, they would not only have discovered that Ramirez's property was in the vehicle (credit card with his name on it), but they would have discovered that I was driving Pineda's car. They would have easilly linked him to the crime. Not only that, every time I stopped he was forced to stop too. He was following his vehicle. In effect, I was actually aiding the officers in their persuit of Pineda versus hindering it. The persuit report helps to establish that. Therefore it was completely unreasonable for Counsel to fail in presenting it.

In short, the introduction of this evidence at trial could have established a record for Counsel to effectively argue to the jury why I should be believed. It could have provided evidentiary support for his request to the jury to return with a guilty verdict for murder as a lesser offense but to return not guilty verdicts for the robbery and carjacking. Absent the record support, both of these inquiries to the jury was ineffective and unreasonable.

Therefore, I allege, Counsel's failure to present the evidence I spelled out in this petition at trial was ineffective and unreasonable in light of the circumstances of this case. It completely failed my defense and my right to have a fair trial.

   d.  Counsel's actual consultation before trial was inadequate because
       it failed to uncover the significance of the evidence in his
       possession and led to its absence from my trial.

29

Counsel's actual consultation with me before trial was simply, the initial consultation where we met and I explained that I had made a statement to investigators. I explained that I wanted to testify at a trial if it came to that. And because I expected it would, I explained that I did not want to take any deals involving conviction of the robbery. (Carjacking was not alleged against me at this point) At a later date he came to tell me there was DNA evidence of mine found inside the Mazda. I explained how it got there. It had nothing to do with this case. At another later date he came to tell me I should accept interview with a medical examiner. I accepted. Finally, several days into trial, two days before I was to testify, he came to prepare it. He left after ten or fifteen minutes.

Counsel never disclosed that Fedele rendered testimony at the conditional examination that evolved to including me in his account. I first discovered that he would be rendering information about the Mazda and a driver the day he testified at trial. Too late to expose the inconsistencies and fact from his previous testimony and statement. Counsel's failure to discuss it with me was unreasonable.

He never discussed Chavez's testimony with me so I could never tell him of the significance of his testimony at the preliminary hearing that he believed he was seeing the passenger side first hand from his window. That was unreasonable.

He never discussed the cellular phone evidence with me. I couldn't explain the significance there either. That was unreasonable for the reasons stated earlier

He never discussed the evidence found inside the mazda with me. I couldn't explain the fact that Chavez said he seen Pineda rip something from the body and return to the opposite side of the mazda points to the wristwatch, since it was the only evidence with those "rip" distinctive marks on it. Chavez's testimony at the preliminary hearing helps to clear that up. The fact that he was mistaken as to which side the of the car the person exited. That it shows Pineda exited the driver side and returned to the passengerside with the property he took. He probably put the wrist watch there. since it was actually found there and there was no evidence of the necklace he thought it was. Simulary, it could have explained why I couldn't account for the evidence showing up on the passenger seat. As soon as he got out of the car I climbed

over the consol. When I finished I seen him walking over towards the truck. That was on the passenger side of the car. I didn't see him actually at the car, but Chavez did. He could have dropped the stuff there then.    Counsel's failure to disscuss the evidence found in the car with me before trial failed to get that arguement some jury exposure. They could have used it in its deliberations. That was unreasonable  for him to allow.

In short, his actual consultation failed to allow me to explain all the evidence I believed to be helpful to my defense. As I did throughout this petition. It failed to allow him to understand the significance of what he had and how it could possibly be presented to the jury to aid my defense's survival. It allowed all the facts explained in this petition to be absent in my trial. It failed my defense and my ability to recieve a fair trial.

Therefore, I allege, Counsel's actual consultation with me before trial was ineffective and unreasonable because it led to the failures explained in this petition. It completely failed my defense and deprived my right to a fair trial.

e.    The cumulative impact of these errors (Counsel's failures) at my trial prejudiced it because it completely undermined the proper functioning of the adversarial testing process.

This petition is ment to challenge Counsel's performance at trial altogether. It goes to show that Counsel understood his role as advocate to my defense required him to effectively challenge the state's evidence where it would implicate me in the robbery and carjacking. His every action at trial seems to indicate that he did understand. But he completely failed to make any of his inquiries effective. It began with his failure to communicate with me before trial.  That led to his failures to present the meaningful evidence he already had in his possession.

I believe that prejudice should be presumed because his actual errors denied my rights to present a defense, to effective cross examination, and a fair trial in general.  All of which are recognized by the U.S. Constitution

31

as being fundamental to the very concept of justice. A denial of any one of those rights is constitutional error of the first magnitude. However, prejudice is evident.

Fedele and Chavez were key prosecution witnesses. Their testimony specific to the Mazda and a driver implicate me in the robbery and carjacking charges. Counsel's argument to the jury that these witnesses were wrong and mistaken in their facts would be completely ineffective if there is nothing on record to prove it. Counsel's actual cross examination made it so that there was nothing to support the argument. The facts I explain could have been exposed to the jury through cross examination were specifically aimed at that. It is evidence that could show that they were unreliable in their accounts of the Mazda and where I was seated. The jury specifically requested to hear their testimony regarding that fact to be read back in its deliberations. There is no way of saying what they would have chose to do with these facts specifically aimed at their inquiry, had they had them to look at. There in lies prejudice.

Counsel's failure to present evidence to corroborate my statement added to that prejudice. I was the only witness presented for the defense. My testimony was the actual defense. Absent some proof of reliability to believe me, the jury really had no reason to. I had nothing to lose and everything to gain. Being that I was the Defendant and all. The absence of the evidence in this petition allowed that avoidable attack on my credibility by the state, as I explained earlier. In other words, the failure to present evidence armed the opponent with ammunition that could have been used as armor to the defense. That itself constituted a surrender of arms in the adversarial testing process.

In short, the cross examination failures and the evidentiary failures combined completely compromised the proper functioning of the adversarial testing process and its ability to produce just results. It completely failed to test key prosecution witnesses and completely failed to support the defense. Both could have been prevented. Had they been, there is no telling what the jury would have chose to do. Absent any indication of reliability, they appear to have wanted to believe that I was not the driver when I said I wasn't. They went to the record to double check the evidence that said otherwise when they

32

went to hear Brannon's, Fedele's, and Chavez's testimony "specific to the Mazda and the location of the person inside it" to aid in their deliberations. If for nothing else, that fact goes to show, that information was heavy on the mind of the jurrors. This petition is aimed at that information and has shown that atleast one of the facts they relied on in its conclusion was faulty(Chavez). The presumption of correctness is undermined and therefore their verdict is lacking the foundation necessary to stand, and should not be permitted.

It is for these reasons, and all the reasons spelled out in this petition, that I humbly come to this court seeking relief.

Therefore, I allege, My conviction is Constitutionally unjust. Ineffective assistance of Counsel. Counsel's performance deprived my right to receive a fair trial. And I pray, this Court will overturn all of my convictions. To grant me a new trial. To allow me to fairly present my defense to a jury, and allow them to fully weigh it against the State's allegations. Please restore the fundamental fairness of my case.

Signed sincerely,

2·11·08.

Alex J. Rosales

33

FEDERAL REVIEW OF THIS CLAIM
IS PERMITTED
28 USC §2254 (d) (1)-(2)

1. The State's adjudication of this claim, where it
   did an issue-by-issue search for prejudice
   resulted in a decision based on an unreasonable
   determination of the facts, and is contrary to,
   and involves, an unreasonable application of
   clearly established federal law, as determined
   by The Supreme Court Of The United States.

One claim was made as the basis for relief. It was simply: Petitioner's
conviction is Constitutionally unjust; Ineffective assistance of counsel;
Counsel's performance at trial deprived Petitioner's right to a fair trial.

The supporting facts started with an underlined heading. It alleged the
latter part of the actual claim; Counsel's performance at trial deprived
Petitioner's right to a fair trial. Below that was allegation of error to
support the claim. Each error was in ALL CAPS to distinguish each error from
the next.

There was a capitalized sentence alleging; Absent the errors, there is a
reasonable probability the fact finder would have a reasonable doubt respecting
guilt. Below it, all the fact alleged to have been erroneously withheld as a
result of Counsel's actual performance was summarized as "evidence" that could
have altered the entire evidentiary picture, if it were believed by the jury.

In other words, nothing in the petition indicates that the error was to
stand alone when it came to prejudice. To the contrary, the allegation "absent
the errors...the fact finder would have...had doubt respecting guilt ", with
error being plural, clearly indicates their cumulative effect is the basis
for relief. As does the singular ground for relief, in the appropriate space
provided by the application itself.

The state court's adjudication of the claim is based on an issue-by-issue

34

search for prejudice.

It made a finding that the first contention went to a question of Counsel's failure to question Fedele regarding when he saw the Mazda make a u-turn and concluded that even if Counsel had established an inconsistency in his trial testimony.."it would not have made a difference in the result."

It found second,    "[t]here was nothing establishing that Chavez could not distinguish between the passenger side of the car and the driver's side."

Lastly, it found that"[t]here is nothing showing that his defense attorney was inadequately prepared at trial because he did not meet with petitioner more often."

The petition requires a cumulative impact determination of prejudice for proper litigation. As this petition shows, it was formatted to fit that premise. It is permitted by law.(Alcala v. Woodford,334 F.3d 862,883, Harris v. Wood,64 F.3d 1432,1438, and Ceja v. Stewart,97 F.3d 1246)

Therefore the state court's adjudication of the claim is based on an unreasonable  determination of fact in light of the evidence presented. Permitting further federal review of it.

On the same facts, the adjudication appears to be contrary to Strickland v. Washington,466 US 668 as interpreted by Lockheart v. Fretwell,113 S.ct.838 and supported by Wilson v Henry,185 F.3d 986. It fails to look to whether the fundamental fairness or  the proper functioning of the adversarial testing process was undermined as a result of the cumulative impact of the error.

Had the state court actually looked to the cumulative impact of the error it would have noticed that the error goes to alter the entire evidentiary picture and a verdict only weakly supported by the record.

An honest, close look to the record shows that this case was essentially a credibility contest between the state's witnesses and myself. The remaining circumstantial evidence could follow either side. For a quick example, look to the closing arguments by counsel. They focus heavily on the testimony of their own witnesses account of the night in question.

The petition before the state court shows that fact exists pertaining to two of the state's key witnesses, Chavez and Fedele. It shows that none of it was exposed to the jury for resolution as a result of counsel's actual

35

cross examination of the witness at trial. It shows that counsel's actual cross examination of Chavez failed to expose fact that would prove his testimony at trial contained faulty fact. It shows that the jury was very interested in Chavez's testimony, specific to the Mazda and the location of the person inside it, that it actually requested a second look at it. It shows that the fact left out of Chavez's testimony at trial goes directly to its inquiry. It shows the same for Fedele.

The petition also showed facts of omitted evidence that could have corroborated the defense's only witness' testimony. It shows that the only witness was actually the entire case for the defense. That his testimony was the extent of its evidence.

It showed that both, failure to expose invaluable fact pertaining to the state's witnesses and the omitted evidence to corroborate the defense, was a result of counsel's actual consultation with me. It showed that he never discussed any thing with me to help him to understand the significance of the evidence in his possession. That led to its absence at my trial.

In short, it showed that counsel's every action would amount to my defense being completely meaningless at trial.

It is for these reasons that the state court's issue by issue search for prejudice is ineffective in observing the actual prejudice. The errors by themselves might not have amounted to much in their perspective but their cumulative impact on the trial itself is what I hoped they would see. Their failure to look to it failed to look to the fundamental fairness and the proper functioning of the adversarial testing process. For that reason their adjudication of the claim is contrary to clearly established federal law, as interpreted by Strickland v Washington 466 US 668 and Lockheart v Fretwell 113 S.ct. 838. Supported by Wilson v Henry 185 F.3d 986. Allowing for further federal review of this claim.

> 2. The state court's finding that the first contention goes to a question of counsel's failure to question witness Fedele about the time he seen the U-turn is based on an unreasonable determination of the facts.
> (lines 4-13 of page two)

Nothing in the petition was to stand alone, above, or below the next error. But,even assuming that each ALL CAPS allegation was ment to stand alone, as the state court did, it could not reasonably be understood that the question goes to whether counsel's failure to question Fedele about the U-turn is the actual contention made by the first ALL CAPS allegation. It is in fact, Counsel's failure to cross examine Fedele regarding his prior inconsistent statements before the jury deprived petitioner's right to effective cross examination. It makes it clear that the question goes to "statements" and counsel's failure to cross examine the witness about them.

Reading further into the two All CAPS statements reserved for Fedele shows exactly what is ment by "inconsistent statements". It points out four specific areas in Fedele's prior hearing statement and points out that he made an initial statement to investigating officers that did not include mention of a mazda or a third person at the scene. The explaination was that all of the pointed out facts needed adequate jury exposure.

Therefore the state courts finding that the contention made in the petition was a question going to whether counsel's failure to question Fedele about the U-turn was ineffective assistance or not is based on an unreasonable determination of the facts in light of the evidence presented. Allowing for federal review of the claim.

3.   The state court's finding that even if counsel had established a contradiction in Fedele's statements "[t]he jury could choose to believe Fedele's testimony at trial in light of the testimony of other witnesses at trial." is based on an unreasonable determination of the facts.

There were a total of four witnesses that rendered testimony specific to the Mazda and the location of the person inside it. Brannon, Fedele, Chavez, and Huang.

Brannon's testimony was simply that she seen the Mazda and the driver's side door was open. That seems to indicate that either the driver was getting into the vehicle, getting out the vehicle, or already out of the vehicle.

In light of the fact that I had a broken ankle and was restricted to the use of crutches for mobility that night and the fact that there is no evidence showing otherwise, it is reasonably understood that it could not have been me doing either of those things with the driver's side door.

The jury requested the court read back the testimony of Chavez, Fedele, and Brannon "specific to the mazda and the location of the person inside." (CT502A-E) They did not include witness Huang in their request. That seems to indicate that they either believed her to be entirely credible and they didn't need to rehear it, or they believed her to be entirely unreliable. An honest, close look to the record will support the latter.

These facts are fundamental to the proper litigation of the petition before the state court. Either it did not observe them or they completely ignored them. The jury request was pointed out on page 1 and page 21 of the petition in paragraph 1 and 105. The rest was included in the facts the conviction is based upon, starting on page 3.

The actual petition itself showed that there was fact from Fedele and Chavez specific to the Mazda and the location of the person inside it. That is the purpose of the petition. To show that they exist but were not exposed to the jury as a result of counsel's ineffective crossexamination of them at trial. He failed to elicit it.

In short, The petition shows that fact regarding the inquiry made by the jury, specific to the Mazda and location of the person inside, was withheld from the jury for two of the three witnesses it was concerned with and the the third one, Brannon, doesn't provide damaging information toward me. The only other witness rendering information against me was Huang but it appears that the jury didn't believe her. The fact omitted was directly related to their inquiry. It was specific to the Mazda and a driver.

Therefore, the state court's finding that despite the contradiction, the jury could still choose to believe Fedele's testimony at trial in light of the testimony of other witnesses at trial is based on an unreasonable determination of the facts. Permitting federal review of this claim.

> 4.  The state court's finding regarding Chavez that
>     there was nothing establishing that he could not
>     distinguish between the passenger side of the car

38

and the driver's side is based on an unreasonable
determination of the facts.

The allegation made regarding Chavez is not to show that he "could not"
distinguish between the sides of the car. It is to show that his testimony at
the preliminary hearing rendered indispensable fact regarding the Mazda and
the location of the person inside it. It is to show that counsel's failure to
cross examine him regarding how he could tell what side he was looking at from
his window failed to elicit that testimony, or similar testimony. It was to
show that had he elicited it, there could have been evidence on the record to
show that Chavez thought the "passenger" side of the car was facing his
window and he made his account of his observations on that fact. It was to
show that that fact was incorrect. That the side of the Mazda facing his
window was in fact the driver's side. Evidence and explanation was presented
to prove it. Perhaps the argument was in artfully presented but the facts
could not have been clearer. There were even diagrams to illustrate the fact.

The point is that Chavez was a key witness in the trial. His testimony
specific to the mazda and the side of the car he believed he was looking at
is what the state used to argue to the jury that evidence pointed toward
guilt. Chavez said I was the driver of the Mazda as it drove up and he knew
simply because someone exited on the passengerside. His belief in which side
of the car was facing his window completely alters that fact. It was wrong.

The state court's determination completely fails to observe these facts.
Instead of finding whether the evidence existed at the hearing and whether
it should have been included in the trial, it appears to decide that the
testimony does not show that Chavez "could not" distinguish between the sides.

However, as explained above, that is not the purpose of the petition nor
is it what the evidence points to. Therefore, the state court's finding here
is based on an unreasonable determination of the facts in light of the evidence
presented. Permitting federal review of this claim.

5.   The state court's finding that there is nothing
     showing that the defense attorney was inadequately
     prepared at trial because he did not meet with

petitioner more often is based on an
unreasonable determination of the facts.

The petition before the state court showed facts that existed prior to
trial regarding two key state prosecution witnesses. It showed that the fact
was aimed directly at their credibility. It showed that at least one of the
facts was entirely incorrect but, none of them were exposed at trial. It
showed that the jury was very interested in these facts. That it actually
requested the witnesses' testimony specific to these facts to be read back in
jury deliberation. It showed that these facts were not included in that
deliberation.

The petition also showed that fact existed that could have corroborated
the defense's only witness' testimony but, it was not presented at trial.
It showed that this evidence was available before trial. It showed that there
was no actual corroboration for the defense's only witness' testimony present
at trial as a result of the actual defense counsel put on.

The petition showed that all of this evidence, including the credibility
evidence of the state witnesses, was already in counsel's possession before
trial.

The allegation was that because counsel failed to visit with me enough
to actually discuss the evidence turned over to him by the state, he could not
have fully understood the significance of the evidence he had. That if he
had come to discuss it with me I would have pointed out the evidence as I
did in the petition. Because he did not, it was completely absent at my trial.

I do not know of any "actual" or "real" way of showing that counsel's
consultation with me was inadequate other than to do as I have. To show that
the evidence existed, that it was in his possession all along, that it was
not at trial, and that I recognized it immediately when I saw it. If he would
have allowed me to go over the evidence prior to trial I would have noticed
its significance then too and I would have pointed it out to counsel had he
just came to discuss it with me. The evidence is not trivial. It goes straight
to the core of this case.

40

Therefore, the state court's finding that there was nothing showing that counsel was inadequately prepared at trial as a result of his actual consultation before trial is based on an unreasonable determination of the facts in light of the evidence presented. Permitting federal review of this claim.

6.  The state's adjudication of this claim, where it
    wants a showing of prejudice for the denied effective
    cross examination of two key prosecution witnesses is
    contrary to clearly established federal law, as determined
    by the Supreme Court of the United States, and is based
    on an unreasonable determination of the facts in light
    of the evidence presented.

The petition before the state court shows that evidence relating to the credibility of two key state witnesses exists but was not exposed to the jury. The court acknowledged it with its determination that despite the fact that the evidence exits, it would not have effected the out come of the trial because "[t]he jury could chose to believe Fedele's testimony at trial in light of the testimony of other witnesses at trial". And that "[t]here was nothing establishing that Chavez could not distinguish between the passenger side of the car and the driver's side".

The question before the court was whether counsel's failure to cross examine these witnesses to elicit the omitted fact at trial constituted a deprivation of effective cross examination.

As explained earlier in this petition, the state court's findings in general are based on an unreasonable determination of the facts in light of the evidence presented, but the actual findings here show that it is also contrary to Davis v Alaska 415, US 308. The court there explained that denied right to effective cross examination would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it. The court explained that counsels actual cross examination was limited and failed to allow an effective inquiry to the jury that a witness might be biased because he failed to make a record to base the inquiry on. It explained that the jury might not believe him other wise and in stead think he was engaged

41

in baseless line of attack on an apparently blameless witness. The court found
that that constituted denial of effective cross examination and prejudice is
a presumed result.(415 US 308,318  94 S.ct. 1105, 1111)

Those facts are identical to this case except the cause of the limited
cross examination actually performed. There, it appears to have been due to
judicial discretion, here however it was due to counsel's actions. His failure
to avail himself the evidence in his possession and allow it to aid in his
cross examination. The result is the same. Both counsel fail  to establish
a record to support inquiry to the jury that the witness is less than reliable
as a result of their actual cross examination of the witness before the jury.
The court said that when that happens it denies the defendant his right to
effective cross examination and prejudice is a presumed result.(415 US 308,318,  94 s.ct 111)

The court in this case decided that despite the fact that counsel failed
to establish the facts  at trial, the result would have been the same. That
finding is contrary to the Supreme Court's finding on similar facts, as stated
above, and therefore allows further federal review of this claim.

What's unique about this case is that everything in the petition before
the state court that is shown to have been withheld from trial is specific
to the Mazda and the location of the person inside it.  The fact is, the jury
actually requested a second look at both these witnesses' testimony during its
deliberations specific to the Mazda and the location of the person inside it.
That shows that this information was heavy in the minds of the jurors and any
attempt of a reviewing court to decide what the jury would have done, whether
it would have changed their minds, had they had this extra information

to weigh against what they already had, would completely usurp their role
as the sole trier of fact and credibility. And yet, that is exactly what the
court appears to have done. Therefore, the state court's adjudication of this
claim is also contrary to clearly established federal law, as determined by
Sullivan v Louisiana 113 S.ct. 2078 and United States v Scheffer 118 S.ct. 1261
because it completely invades the sole province of the jury. Permitting
federal review of this claim.

42

7. The state court's adjudication of this claim
   failed to include, and resolve, all of the
   information presented.

The petition was presented as a single claim but included several key parts to support it. The state court attempted to resolve three out of those four but based its conclusion on an unreasonable determination of the facts as explained in the first six parts of this petition. But it is also deficient because it completely failed to adjudicate the section in the petition before it alleging that counsel failed to present evidence favorable to the defense.(starting on pg. 32 and ending at 35)

That section is important to the proper litigation of the claim because the claim alleges that counsel's performance deprived my right to receive a fair trial and alleges that all the error as a whole amounted to deficient performance and would have effected the outcome. Aside from that, the evidence absent from trial goes to corroborate the defense. There was no other evidence presented at trial to support the defense. The petition alleges that counsel's failure to present the evidence failed my right to presenting a meaningful defense.

Therefore the state court's adjudication of this claim is based on an unreasonable determination of the facts in light of the evidence presented. Allowing for federal review of this claim.

Sincerely,        4·11·08

Alex J. Rosales

43

California State University Police
San Jose State University
**INCIDENT REPORT**

NARRATIVE

One Washington Square, San Jose, California 95192-0017

LOCATION OF ORIGINAL INCIDENT (IF KNOWN)
475 So. Fifth Street

| | Report Agency Assist |
| Type |
| Case    03-1149 |
| Number |

VICTIM'S NAME: LAST, FIRST, MIDDLE (FIRM, IF BUSINESS)
Ramirez Jose Luis

(   ) STUDENT
(   ) EMPLOYEE

CONTROLLED DOCUMENT

Released for:

By:

Date:                    DO NOT DUPLICATE

## INVESTIGATION:

On 7/10/2003 at about 0100 hours, I was at the corner of So. Sixth Street and E. San Salvador Street when I was flagged down by a W/M/A on a bicycle. The W/M/A ( later Identified as Rodney Fedele ) reported that there was "someone getting beat up with a bat" about three streets down ( West from So.Sixth Street). I immediately drove west on E. San Salvador to So. Fourth Street and W-1 Fedele yelled and said " you went too far." I backed up to So.Fifth Street and went southbound . I advised dispatch of the possible assault that had just occurred. As I drove south on Fifth Street from E. San Salvador Street, I saw the head lights of two vehicles. The vehicles went into reverse , made a U-turn and then went westbound on E. William street . I saw that one of the vehicles was a red SUV type vehicle. I drove south to about mid block on South Fifth Street and located a latino male adult laying face down with his hands at his sides. The victim was approximately 7 feet from the west side curb line ( east of 475 So. Fifth Street). There was a large puddle of blood around the victim's head and I saw that his chest was moving up and down with heavy breathing. I advised dispatch of the person down and to send the fire department and paramedics. Officer Beavers was following behind me and he went in pursuit after the possible suspect vehicles. Officer Beavers asked for the description of the suspect vehicle and I advised him that the suspect vehicle was possibly a red SUV type. Officer Beavers went west bound on E. William Street and found a red truck with a camper shell stopped at the Fourth Street traffic lights. Officer Beavers attempted to stop the vehicle, however , a pursuit ensued ( see Officer Beaver's and Officer Anaya's supplemental reports).

I stayed with the Victim who was identified as Jose Luis Ramirez. V- Ramirez was bleeding profusely from multiple, head wounds. Ramirez was moaning slightly and breathing with difficulty. I reassured him and told him that help was on its way and to keep breathing for me. I told dispatch to call San Jose PD for assistance. At 0116 hours, Fire Engine 3 arrived and examined the victim. Capt. David Jimenez asked for the victim information and I relayed the information by showing him the victims ID card ( I found the victims information in his right rear pants pocket.). Capt. Jimenez saw the victim and said that he may have been "dragged" for a distance. V-Ramirez stopped breathing and Fire personnel began CPR procedures. AMR unit 643 transported Ramirez to San Jose ER where he was subsequently pronounced dead by medical authorities (see Officer Anaya's supplemental report). I contacted W-1 Fedele at the scene and I asked him again what he had seen. Fedele said that he was riding his bike So. Fifth Street near William Street when he heard an argument about 75 feet north of where he stood. Fedele said he saw a male subject beating someone with a baseball bat. Fedele said that he did not want to get any closer for fear of being beaten by the suspect. I asked Fedele if he was able to identifiy any of the suspects. Fedele said " No"

At about 0140 hours, California Highway Patrol Officer Barret # 16484 and Price #17319 arrived and offered to assist me. I asked them to set up a perimeter and to block off each street

| RECORDING OFFICER NAME | ID NUMBER | DATE | TEAM | SUPERVISOR REVIEW | DATE | PAGE |
|---|---|---|---|---|---|---|
| Ramirez | R6744 | 7/10/03 | C | | | 3 |

44

PETITIONER'S EXIBIT 1

Diagram of Fifth Street derived from Officer Conrad's testimony at trial

(RT 251-267,272-276,287-291)

With the Mazda in place



45

PETITIONER'S EXIBIT  2

Diagram of Fifth Street with San Salvador at the top

derived from Chavez's testimony at trial

(RT 345–347)



46

PETITIONER'S EXIBIT 3
Diagram of Fifth Street derived from Officer Conrad's testimony at trial
and Chavez's testimony at the preliminary examination
and at trial
(RT 251-267,272-276,287-291,345-347,Ct 36-37)



47

DECLARATION

I <u>Gloria A. Sandoval</u>, hereby declare that I recieved the partial case files for case #CC319535, from an associate of the Santa Clara County Public Defender's Office located at 120 West Mission Street in San Jose, California 95110, on or about January 19,2007.

I was thereby notified that there was a copy of Jose Luise Ramirez's cellular phone toll records for July 10,2003.

The name of the associate was <u>Ken Mendal</u>.


Dated <u>3/23/07</u>                    Signed <u>Gloria A. Sandoval</u>


Contact info.
Gloria A. Sandoval
3217 Woodstock ct.
Modesto, ca. 95354
Home: 209-577-2526
Cell: 209-484-5104


48

# PURSUIT REPORT

**CHP 187** (Rev 2-94) OPI 044

NUMBER - For CHP Use Only

NUMBER - Other Agency Use Only
03-1149

## IMPORTANT - READ CAREFULLY

Vehicle Code Section 14602.1 requires that "every state and local law enforcement agency, including, but not limited to, city police departments and county sheriff's offices, shall report to the Department of the California Highway Patrol, on an approved form, all vehicle pursuit data." This form has been developed to record information.

The definition of "vehicle pursuit" and instructions for completing and submitting this form are on the reverse.

## SECTION I - THIS SECTION IS MANDATORY FOR ALL CALIFORNIA LAW ENFORCEMENT AGENCIES

| A. CHP AREA/AGENCY NAME | B. AGENCY NCIC | C. DATE OF PURSUIT | D. TIME OF PURSUIT | E. TOTAL TIME OF PURSUIT (Minutes) |
|---|---|---|---|---|
| CSUPD SAN JOSE | 0 4 3 1 7 | 7-10-03 | 0103 HRS | 6. MINUTES |

**F. DID YOUR AGENCY/AREA INITIATE THE PURSUIT?** a ☒ Yes  b ☐ No

**G. I.D. NUMBERS OF OFFICERS INVOLVED** (Do Not List Names): B0858 IPM436

**H. IF THE SUSPECT WAS** ☒ WAS NOT ☐ **APPREHENDED, WHICH ONE OF THE FOLLOWING MOST NEARLY DESCRIBES THE EVENT TERMINATING THE PURSUIT?**

- a ☒ Pursued driver voluntarily stopped
- b ☐ Forcible stop
- c ☐ Pursued vehicle became disabled
- d ☐ Pursuing vehicle became disabled
- e ☐ Pursuit aborted by law enforcement agency
- f ☐ Pursued vehicle and pursuing vehicle collided
- g ☐ Pursued vehicle involved in collision
- h ☐ Pursuing vehicle became involved in collision
- i ☐ Pursuit continued by allied agency
- j ☐ Pursued vehicle escaped pursuing vehicles
- k ☐ Other:

**I. ORIGINAL VIOLATION** OBSERVED BY AGENCY INITIATING THE PURSUIT
SECTION: 245 P.C. CODE: a ☒ Felony  b ☐ Misdemeanor  c ☐ Infraction  d ☐ Other:

**J. MOST SERIOUS VIOLATION** SUSPECT(S) CHARGED WITH UPON TERMINATION OF THE PURSUIT
SECTION: 187 CODE: P.C. a ☒ Felony  b ☐ Misdemeanor  c ☐ Infraction  d ☐ Other:

**K. WERE THERE ANY INJURIES INCURRED AS A RESULT OF A COLLISION?** a ☐ Yes  b ☒ No
If yes, indicate the number of each type of injury:

| | Police Officer(s) | Suspect(s) | Other(s) |
|---|---|---|---|
| Fatal Injury | ___ | ___ | ___ |
| Severe Injury | ___ | ___ | ___ |
| Other Visible Injury | ___ | ___ | ___ |
| Complaint of Pain | ___ | ___ | ___ |

**L. WERE ANY INJURIES INCURRED AFTER THE VEHICLE PURSUIT?** a ☐ Yes  b ☒ No
If yes, indicate the number of each type of injury:

| | Police Officer(s) | Suspect(s) | Other(s) |
|---|---|---|---|
| Fatal Injury | ___ | ___ | ___ |
| Severe Injury | ___ | ___ | ___ |
| Other Visible Injury | ___ | ___ | ___ |
| Complaint of Pain | ___ | ___ | ___ |

## SECTION II - THIS SECTION IS MANDATORY FOR CHP

**M. LOCATION AND/OR ROUTE(S):** WNB Everilliand, N/B 3 RD ST, E/R SAN CARLOS S/B 4TH ST, N/B 2ND, S/B 87, N/B LELONG, W/B WILLOW, S/B 2ND 5

| N. AGENCY INITIATING THE PURSUIT | O. CHP PARTICIPATION REQUESTED? | P. NAME OF REQUESTING PERSON |
|---|---|---|
| CSUPD SAN JOSE | a ☐ Yes  b ☒ No  c ☐ N/A | |

| Q. NAME OF SUPERVISOR IN CHARGE | R. TIME NOTIFIED | S. SUPERVISORY INVOLVEMENT IN PURSUIT |
|---|---|---|
| SGT. ANING RAMIREZ | 0100 HRS | a ☐ In Pursuit  b ☒ Via Radio  c ☐ Via Telephone  d ☐ None |

| T. HIGHEST NUMBER OF CHP UNITS IN PURSUIT AT ONE TIME | U. NUMBER OF ALLIED AGENCY UNITS INVOLVED | V. OTHER CHP AREAS INVOLVED |
|---|---|---|
| Ground ___  Air ___ | Ground 2  Air ___ | |

| W. TOTAL PURSUIT LENGTH (Distance) | X. ROADWAY TYPE - MAXIMUM SPEED ATTAINED |
|---|---|
| 3.5 MILES | ☐ Maximum Freeway Speed: 60    ☐ Maximum Surface Street Speed: 65 |

**Y. IF THE "YES" BOX WAS CHECKED FOR SECTION "K" ABOVE, COMPLETE THE FOLLOWING BOXES REGARDING THE COLLISION:**
- a ☐ CHP involved
- b ☐ Other law enforcement agency involved
- c ☐ Pursued vehicle involved
- d ☐ Other party involved

**Z. TYPE OF FORCIBLE STOP IMPLEMENTED:**
a ☒ None  b ☐ Spike Strip  c ☐ Roadblock  d ☐ Ramming  e ☐ Channelization  f ☐ Other

| AA. CHP GUIDELINES FOLLOWED? | BB. DAMAGE TO CHP EQUIPMENT? | CC. INJURY TO CHP PERSONNEL? |
|---|---|---|
| a ☐ Yes  b ☐ No | a ☐ Yes  b ☐ No | a ☐ Yes  b ☐ No |

**DD. SUSPECT NAME(S):** SERGIO TIMOTHY PINODA

**EE. SUSPECT STATUS:** a ☒ In-custody  b ☐ Released

**FF. EVADED ARREST BY:** a ☐ On Foot  b ☒ In Vehicle  c ☐ Other:

**GG. PURSUED VEHICLE TYPE:** a ☐ Automobile  b ☐ Truck Tractor/Trailer  c ☐ Motorcycle  d ☒ Pickup/Van  e ☐ Other

| HH. YEAR | II. MAKE | JJ. MODEL | KK. LICENSE |
|---|---|---|---|
| 1998 | TOYOTA | TACOMA | 6005976 |

**FORMS ATTACHED:** ☐ CHP 555  ☐ CHP 202  ☐ CHP 206  ☐ STD 270  ☐ STD 268

**COPY OF CHP 187 FORWARDED TO:** ☐ Production Controls  ☐ Division

SUPERVISOR'S SIGNATURE

COMMANDER'S SIGNATURE

DIVISION APPROVAL

CHP ONLY - REFER TO HPM 70.6, CHAPTER 4, FOR INSTRUCTIONS ON COMPLETING SECTION II AND THE NARRATIVE/CRITIQUE
USE PREVIOUS EDITIONS UNTIL DEPLETED.

46

1

2

3

4            SUPERIOR COURT OF CALIFORNIA  **FILED**

5                COUNTY OF SANTA CLARA          MAY 0 9 2007

6                                                   KIRI TORRE
                                                Chief Executive Officer
7    In re                    )              Superior Court of CA County of Santa Clara
                              )          BY _____ DEPUTY
8    ALEX ROSALES             )     No. CC319535
                              )
9                             )     O R D E R
                              )
10   On Habeas Corpus         )
     _____)
11

12        ALEX ROSALES ("Petitioner") petitions for a writ of habeas

13   corpus.  Petitioner contends his trial counsel was ineffective.

14        In order to demonstrate ineffective assistance of counsel, a

15   defendant must show (1) that his or her counsel's performance was

16   deficient because the lawyer's representation fell below an objective

17   standard of reasonableness under prevailing professional norms and

18   (2) counsel's deficient performance subjected the defendant to

19   prejudice, i.e., there is a reasonable probability that, but for

20   counsel's failings, the result would have been more favorable to the

21   defendant. (Strickland v. Washington (1984) 466 U.S. 668, 687-688,

22   cited in In Re Harris (1993) 5 Cal.4th at 832-833; In Re Alvernas

23   (1992) 2 Cal.4th 924, 936-937 and People v. Haskett (1990) 52 Cal.3d

24   210, 248.)

25        Our high court has stated "a defendant's self-serving statement

26   after [] conviction, and sentence [], is insufficient in and of itself

27   to sustain the defendant's burden of proof as to prejudice, and must

28

                              5D

1  be corroborated independently by objective evidence.  A contrary

2  holding would lead to an unchecked flow of easily fabricated claims."

3  (In re Alvernaz (1992) 2 Cal.4th 924, 938.)

4      Petitioner herein has failed to show ineffective assistance.

5  Petitioner contends his attorney failed to adequately cross-examine

6  certain witnesses during his trial.  Petitioner first contends that

7  his attorney failed to question witness Fedele as to when he saw the

8  Mazda make a U-turn.  Even if the petitioner's attorney had

9  established that Fedele at the preliminary hearing stated he saw the

10 Mazda make a U-turn after he flagged after down police, it would not

11 have made a difference in the result.  The jury could choose to

12 believe Fedele's testimony at trial in light of the testimony of other

13 witnesses at trial.

14     Petitioner's attorney was furthermore not ineffective in his

15 cross examination of witness Chavez.  There was nothing establishing

16 that Chavez could not distinguish between the passenger side of the

17 car and the driver's side.

18     Lastly, petitioner has failed to show that his attorney failed to

19 adequately meet with him prior to trial.  There is nothing showing

20 that his defense attorney was inadequately prepared at trial because

21 he did not meet with petitioner more often.

22     Therefore, the petition for a writ of habeas corpus is DENIED.

23 DATED: ___8 May___, 2007    _____



                                   PAUL BERNAL
24                                 JUDGE OF THE SUPERIOR COURT

25

26 cc:  Petitioner
     District Attorney
27   Research
     CJIC

28

51



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



Court of Appeal - Sixth App. Dist.

**FILED**

JUL 2 7 2007

MICHAEL J. YERLY, Clerk

By _____
                    DEPUTY

In re ALEX ROSALES,

on Habeas Corpus.

H031589
(Santa Clara County
 Super. Ct. No. CC319535)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated ___JUL 2 7 2007___     ___BAMATTRE-MANOUKIAN, J.___ Acting P.J.

52

S155999

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re ALEX JESSE ROSALES on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAR 2 6 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

53

ALEX JESSE ROSALES.
V-76001 A4.147
P.O. Box 409020
Ione, Ca. 95640.

RECEIVED

APR 18 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Clerk of The United St
Court for the North
of California.

450 Golden Gate Avenue
San Francisco Ca.

