1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*__E-FILED - 6/29/10__*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ALEX JESSE ROSALES, | ) | No. C 08-2104 RMW (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION |
| | ) | FOR WRIT OF HABEAS |
| vs. | ) | CORPUS; DENYING |
| | ) | CERTIFICATE OF |
| MARTEL, Warden, | ) | APPEALABILITY |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition should not be granted.  Respondent has filed an answer addressing the merits of the petition.  Petitioner filed a traverse.  Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and denies the petition.

**BACKGROUND**

On July 10, 2003, witness Rodney Fedele was riding his bicycle on Fifth Street in San Jose.  (Resp. Ex. E, (People v. Rosales, California Court of Appeal, Sixth Appellate District, Case No. H028891, May 4, 2006) at 3.)  He saw a "guy" beating someone with a baseball bat and going through his pockets.  (Id.)  The man getting beaten was leaning up against a little gold or silver car.  (Id.)  Fedele saw someone in the driver's seat of the car yelling back and forth with

1  the man with the bat.  (<u>Id.</u>)  Fedele saw the man with the bat hit the victim at least 10 times.  (<u>Id.</u>)

2  Fedele left to call an ambulance but ran into the police, so showed the police where the man was

3  being beaten.  (<u>Id.</u> at 3-4.)  When Fedele found the victim, he noticed that the victim was no

4  longer in the same place as he was initially; the victim was instead "laid out in the middle of the

5  road."  (<u>Id.</u> at 4.)

6       That same day around 12:35 a.m., witness Xioa Hong Huang heard a banging noise

7  outside on the street.  (<u>Id.</u>)  She lives on Fifth Street and her window faces the street.  (<u>Id.</u>)

8  Huang testified that she saw a man pick up a baseball bat, and a silver car drive up to the man to

9  ask if everything was okay.  (<u>Id.</u>)  The man with the bat replied that it was and entered into an

10  alleyway.  (<u>Id.</u>)  The car drove off and a truck drove out and followed the first car.  (<u>Id.</u>)

11       Around 1:00 a.m., witness Natalye Brannon, who also lived on Fifth Street, heard what

12  sounded like an argument outside her apartment.  (<u>Id.</u>)  She heard someone say, "Get away from

13  my car, get away from me."  (<u>Id.</u>)  She heard struggling and saw a small car parked down the

14  street with the driver's side door open.  (<u>Id.</u>)  She stepped away from the window to get ready for

15  bed and when she got into bed, she heard loud car noises that sounded like a car being driven

16  fast.  (<u>Id.</u> at 4-5.)  She looked out the window and saw what looked like a bigger, red car driving

17  away, and also saw a person lying in the middle of the street.  (<u>Id.</u> at 5.)

18       Witness Javier Chavez, who also lived on Fifth Street, heard what sounded like

19  something metallic hitting the ground and when he looked out of his window, he saw a body

20  lying in the street.  (<u>Id.</u>)  Then, he saw a small car drive up close to the front of the body and

21  watched someone carrying a baseball bat get out of the passenger side of the car, push the body

22  over with the bat, and take something from the body's neck.  (<u>Id.</u>)  Chavez also saw this man go

23  through the pants' pockets.  (<u>Id.</u>)  The driver did not get out, but the passenger approached the

24  driver and it looked like the passenger handed something to the driver and they were talking.

25  (<u>Id.</u>)  Then the passenger walked over to a nearby truck.  (<u>Id.</u>)  Chavez watched the car run over

26  the body on the ground and drag it about five car lengths before it reversed and ran over the body

27  again.  (<u>Id.</u>)  The car left and the truck followed.  (<u>Id.</u>)

28       Fedele found Sergeant Amado Ramirez, a police officer, and led him to the location of

the incident.  (Id.)  At around the same time, Officer Beavers was being told about someone

getting beaten with a baseball bat.  (Id.)  Beavers followed Ramirez.  (Id.)  When Ramirez turned

onto Fifth Street, he saw headlights in front of him.  (Id.)  Ramirez saw the victim lying face-

down in the street and went to tend to him while Beavers noticed a maroon Tacoma truck behind

a gray Mazda at a stoplight about a block and a half away from the victim.  (Id. at 6.)  Beavers

tried to stop the cars using emergency lights, but when he got out of his patrol car, both vehicles

continued moving.  (Id.)

Eventually, officers pulled over the Tacoma while the other car got away.  (Id.)  When

asked about the driver of the Mazda, the driver of the Tacoma said, "He didn't have anything to

do with this.  I did what I did for my own reason.  I was the only one involved."  (Id.)  Beaver

found a bat in the truck and the driver was identified as petitioner's co-defendant, Sergio Pineda.

(Id.)

An expert testified at trial that the victim, Ramirez, died as a result of multiple blunt force

crush injuries of the chest which were consistent with him being run over by a car.  (Id. at 7.)

Further, there were burns on the victim's body that was consistent with his body being exposed

to the hot undercarriage of a car.  (Id.)

On the front seat of the Mazda, police found a wristwatch and a black plastic holder for a

Motorola cell phone.  (Id. at 8.)  A Nokia cell phone was found as well which displayed

petitioner's nickname, "Happy."  Also inside the car was a credit card issued to "Jose L.

Ramirez," the victim.  (Id.)

Petitioner testified in his own defense.  (Id.)  He said that in early July 2003, he broke his

right ankle and needed to use crutches and wear a cast.  (Id.)  On July 9, 2003, Pineda came to

petitioner's house in Modesto and petitioner agreed reluctantly to go with Pineda back to San

Jose.  (Id.)  Petitioner considered Pineda to be like a brother.  (Id.)  They drove to Pineda's

father's house where Pineda and his dad drank alcohol and petitioner smoked pot.  (Id.)  Later

on, Pineda and petitioner went out to several bars and ran into the victim.  (Id.)  Petitioner

testified that Pineda said the victim looked very drunk and he was going to rob the victim.  (Id. at

8-9.)  Petitioner told Pineda not to do it because petitioner was on probation and had three small

1 daughters so he did not want any trouble. (Id. at 9.)

2    Pineda asked the victim if he wanted to go with them to a party and the victim was

3 excited. (Id.)  The victim walked over to his truck and followed Pineda and petitioner over to an

4 alley. (Id.) Petitioner was rolling a joint the whole time and did not participate in anything that

5 Pineda did. (Id.)  Pineda parked his Mazda and got out of the car. (Id.)  Petitioner knew that

6 Pineda was going to rob the victim but thought that he would not be involved and continued to

7 roll his joint. (Id.)  Pineda and the victim were talking and then petitioner heard a thump and

8 saw Pineda hitting the victim with a baseball bat approximately eight to ten times in the head and

9 body. (Id.)

10    Petitioner testified that he yelled at Pineda to stop, but he did not get out to help the

11 victim. (Id.)  Petitioner saw Pineda going through the victim's pockets and then got into the

12 driver's seat of the Mazda and turned the car around. (Id.)  Pineda drove toward the intersection

13 but then realized that he didn't get any money from the victim, so turned around to return to the

14 victim and parked next to the victim's body. (Id. at 9-10.)  Pineda got out and petitioner got into

15 the driver's seat and drove away, hitting the victim accidentally and dragging him down the

16 street. (Id. at 10.)  Then, petitioner put the car in reverse to dislodge the victim's body. (Id.)

17 Petitioner testified that he did not know any of the victim's property was in the car, nor did he

18 know that Pineda was going to take the victim's truck. (Id.)

19    Petitioner panicked and called Pineda's father using the victim's cell phone. (Id.)

20 Pineda's father told petitioner to get rid of the car so petitioner drove the Mazda to a hotel

21 parking lot. (Id.)  Petitioner called his mother and asked her to come pick him up. (Id.)

22 Petitioner told his mother that the incident came from a "road rage" confrontation. (Id.)  While

23 he was talking to his mother, petitioner heard Pineda's cell phone ring and realized that he had

24 been talking on the victim's cell phone. (Id.)  Petitioner threw the victim's cell phone and some

25 marijuana into a trash can and then got a ride to a nearby Shell station. (Id.)

26    The following day, officers came to Modesto. (Id. at 11.)  Petitioner initially lied about

27 where he was, but after he was told that the victim died, petitioner admitted that he was

28 responsible for the victim's death. (Id.)

1    Petitioner was convicted in a jury trial in Santa Clara County Superior Court of first

2    degree felony murder, robbery and carjacking.  The trial court sentenced petitioner to a term of

3    life in state prison without the possibility of parole.  On direct appeal, the state appellate court

4    affirmed the judgment, and the state supreme court denied the petition for review.  Thereafter,

5    petitioner filed unsuccessful habeas petitions in all three levels of the California courts.  The

6    instant federal petition was filed on April 23, 2008.

## DISCUSSION

7

8    **A.  Standard of Review**

9    This court may entertain a petition for writ of habeas corpus "in behalf of a person in

10   custody pursuant to the judgment of a state court only on the ground that he is in custody in

11   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

12   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

13   may not grant a petition challenging a state conviction or sentence on the basis of a claim that

14   was reviewed on the merits in state court unless the state court's adjudication of the claim

15   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

16   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

17   resulted in a decision that was based on an unreasonable determination of the facts in light of the

18   evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong applies

19   both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S.

20   362, 384-86 (2000), while the second prong applies to decisions based on factual determinations,

21   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

22   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

23   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

24   law or if the state court decides a case differently than [the] Court has on a set of materially

25   indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an

26   "unreasonable application of" Supreme Court authority, falling under the second clause of

27   § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

28   Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

1    case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because

2    that court concludes in its independent judgment that the relevant state-court decision applied

3    clearly established federal law erroneously or incorrectly." Id. at 411.

4        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

5    will not be overturned on factual grounds unless objectively unreasonable in light of the

6    evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.  The court must

7    presume correct any determination of a factual issue made by a state court unless the petitioner

8    rebuts the presumption of correctness by clear and convincing evidence.  See 28 U.S.C. §

9    2254(e)(1).

10       In determining whether the state court's decision is contrary to, or involved an

11   unreasonable application of, clearly established federal law, a federal court looks to the decision

12   of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

13   LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, the court looks to the decision

14   of the Santa Clara Superior Court, which issued the last reasoned decision on these claims.

15   **B.    Petitioner's Claims**

16       Petitioner raises several claims of ineffective assistance of trial counsel: (1) counsel

17   failed to properly cross-examine Fedele; (2) counsel failed to properly cross-examine Chavez;

18   (3) counsel failed to present certain corroborating evidence; (4) counsel failed to adequately

19   consult with petitioner prior to trial; and (5) the cumulative effect of counsel's errors resulted in

20   ineffective assistance.

21       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

22   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

23   counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any

24   claim of ineffectiveness must be whether counsel's conduct so undermined the proper

25   functioning of the adversarial process that the trial cannot be relied upon as having produced a

26   just result.  Id.

27       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

28   must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

1   that it fell below an "objective standard of reasonableness" under prevailing professional norms.

2   Strickland, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's

3   deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

4   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

5   reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

6          1.      Cross-examination of Fedele

7          Petitioner claims that counsel should have cross-examined Fedele regarding several

8   instances of inconsistencies in his testimony.  Specifically, petitioner argues that counsel failed

9   to point out that: (a) during Fedele's conditional testimony[1], Fedele said that he saw the silver

10  car make a u-turn *after* he notified a police officer about the victim while at trial, Fedele testified

11  that he saw the car make a u-turn *before* he notified any police officer (Petition at 21); (b) during

12  the conditional testimony, Fedele testified that he pointed out the silver car to the police as the

13  car involved, but at trial, the police officers testified that they were only focused on the red truck

14  (id. at 22); (c) during the conditional testimony, when asked to position the person Fedele saw

15  inside the silver car at the time of the beating, Fedele first answered that the person was to his

16  left and then changed his answer to state that the person was on his right (id. at 21); (d) during

17  the conditional testimony, Fedele could not recognize the Mazda in the photograph (id.); and (e)

18  Fedele's initial statement to the police did not include any information about the silver car or a

19  driver (id.).

20         At trial, petitioner's defense was that he was not the planned getaway driver of the

21  robbery but that he was attempting to remain uninvolved, was ignorant of what Pineda was

22  doing, was unaware that there was any of the victim's property in the car, and stayed in the

23  passenger seat the entire time.  Petitioner's theory was that after he and Pineda drove away from

24  the victim the first time and Pineda discovered that he retrieved nothing of value from the victim,

25

26         ───────────────

27         [1]  The parties agreed to conditionally examine Fedele prior to trial based on the
     possibility that he might not be available to testify at trial because he was a transient.  (Ex. C at
     323-325.)  Because Fedele was in custody at the time of trial, his testimony at the conditional
28   examination was not admitted.

1    Pineda drove back to the victim to take other items.  As soon as Pineda got out of the car,

2    petitioner said he climbed over the console from the passenger seat into the driver's seat and

3    drove away out of fear.

4         The superior court rejected petitioner's claim that counsel should have pointed out

5    Fedele's inconsistency about when he observed the Mazda make a u-turn stating, "Even if the

6    petitioner's attorney had established that Fedele at the preliminary hearing stated he saw the

7    Mazda make a U-turn after he flagged after [sic] down police, it would not have made a

8    difference in the result.  The jury could choose to believe Fedele's testimony at trial in light of

9    the testimony of other witnesses at trial."  (Petition at 51.)

10        A review of the record demonstrates that any inconsistency was minor.  As respondent

11   points out, the Mazda made two u-turns during the course of the night -- once after the initial

12   robbery, and again after Pineda discovered he retrieved no money.  (Ex. E at 9-10.)  Fedele

13   testified that he observed what was happening at three different times -- once when he first rode

14   by and thought a police man was frisking someone, next when he turned around to clarify what

15   he was seeing, and again when he came back to the scene after notifying the police.  (Ex. E at 9-

16   10.)  It is possible that Fedele saw the car making a u-turn both before and after he flagged down

17   the police, however, the detailed turn of events is not very clear.

18        Methods of case presentation are within counsel's professional judgment to which the

19   court affords great deference.  See Strickland, 466 U.S. at 688-89; Yarborough v. Gentry, 540

20   U.S. 1, 5-6 (2003) (per curiam).  Considering the theory of defense -- that petitioner was in the

21   passenger seat during the beating and robbery -- the court concludes that regardless of whether

22   Fedele saw the car make a u-turn just before or just after he notified the police, Fedele's

23   recollection of timing of the u-turn was collateral.  Counsel could have made a strategic decision

24   not to call attention to this alleged inconsistency because it was a minor fact.  See Strickland,

25   466 U.S. at 688-89.  Morever, even if counsel did raise it, it would not have made a difference to

26   the outcome of trial.

27        Regarding petitioner's claim that Fedele testified that he pointed out the silver car to the

28   police as the car involved but at trial, the police officers testified that they were only focused on

1   the red truck, the court again concludes that these statements were not necessarily inconsistent.

2   In both testimonies, although Fedele testified that the beating occurred next to the small silver

3   car, he consistently testified that both the red truck and silver car were speeding away from the

4   police officers who began pursuit. (Ex. C at 337-338.)  While true that Fedele mostly testified

5   about the small silver car, he had no reason to discuss the red truck because it was not involved

6   until Pineda drove it away.  At the time the police showed up, both the truck and the car were

7   already leaving the scene with the truck following the car.  By the time Sergeant Ramirez arrived

8   at the scene, he only noticed the truck so he relayed that information to the other officers.  (Ex. E

9   at 6.)  Moreover, the court concludes that even assuming the testimony was inconsistent, in light

10  of the theory of defense, it was collateral to the contested issues and would not have made a

11  difference at trial.

12        Regarding petitioner's claim that Fedele's conditional testimony changed his mind about

13  whether the person he saw in the car at the time the victim was beaten was sitting to the right or

14  left-hand side of the car, the court is not persuaded.  A review of the conditional examination

15  testimony reveals that Fedele was merely confused from the form of the questions.[2]  At no time

16  _____

17        [2]  Q: What direction was the car?  Was the front of the car pointed towards you or away
     from you?

18        A: This was after they beat him.
          Q: No.  It is the first time that you say [sic] him.

19        A: It was pointed out, up towards Williams.
          Q: Was the front of the car pointed towards you ro away from you?

20        A: It was pointed towards me because I was up on Williams.
          Q: Okay.  And with the car pointed towards you, was the person you saw in the car on the

21   right or left side?

22        A: On the driver's side.
          Q: Was he on the right or the left side?

23        A: I don't know.  It would be the left side.

24        MR. BOWMAN: Judge, I'm going to object to that question as it's vague.  Is he
     saying left side of the car or his left side, or whatever?  I don't think it's clear.

25        MR. VAUGHN: I can restate it.

26        Q: The person that you saw inside of the car, from the way that you were looking at
     them, were they seated to your left or to your right?

27        A: The car was pointing up.  They were on this side of the car sitting in the driver seat.
          Q: So you just, with your right hand you motioned to your left hand.  So they were --

28        A: Well, if I was looking at them this way like I was, they was on this side.

1    did Fedele waver in his testimonies or statements that during the beating, he observed someone

2    sitting in the driver's seat behind the steering wheel.  (RT 103-104; Ex. C at 328, 343, 344, 352.)

3    Accordingly, the court concludes that counsel was not deficient for refraining from cross-

4    examining Fedele on this issue at trial.

5    　　　Regarding petitioner's claim that counsel should have addressed the fact that Fedele

6    could not positively identify a photograph of the Mazda during his conditional examination, the

7    court disagrees.  Counsel could have reasonably determined that pointing out to the jury that

8    Fedele could not positively identify a photograph of the car during the conditional examination

9    would not have any value because the jury already knew that Fedele believed the car was "gold

10    or silver" and could not say for certain what type of car it was.  Further, that Pineda's car was

11    involved was not an issue in dispute.  In addition, that Fedele could not positively identify a

12    photograph of Pineda's car does not affect his reliability to recall whether he observed a person

13    sitting in the driver's seat when the victim was getting beaten.  Accordingly, the court concludes

14    that counsel was not deficient for refraining from cross-examining Fedele on this issue at trial.

15    　　　Finally, petitioner claims that counsel should have asked Fedele why Sergeant Ramirez's

16    initial police report has no mention of petitioner observing someone in the driver's seat or of

17    petitioner observing a small silver car.  However, questioning Fedele about why Sergeant

18    Ramirez's contemporaneously written notes said nothing about a car or a driver would have

19    revealed no helpful information regarding the reliability of Fedele.  Whether Fedele mentioned

20    the car and existence of a driver to Sergeant Ramirez is a separate question from why Sergeant

21    Ramirez's notes do not mention a silver car.  The court concludes that counsel's decision not to

22    cross-examine Fedele on this was not deficient.

23    ─────────────────

24    　　　THE COURT: For the record, the witness has used the right arm to show that
      direction.

25    　　　Q:  So looking at them this way the person that you saw was on, you also motioned --

26    　　　A: If I was looking at them, the car was parked on this side of the street and the driver
      was on this side behind the steering wheel.  Don't confuse me because I got dyslexia, and you're

27    trying to get me all confused.

28    (Ex. C at 343-344.)

1    Thus, petitioner is not entitled to habeas relief on this claim.

2         2.    Cross-examination of Chavez

3         Petitioner claims that counsel was ineffective in his cross-examination of Chavez.

4    Specifically, petitioner argues that if counsel had questioned Chavez properly, the jury would

5    have known that even though Chavez testified that from his apartment window and point of

6    observation was closest to the passenger side of the car during the incident, Chavez's street

7    address demonstrated that in fact, his apartment window and point of observation was closest to

8    the driver's side of the car.  Thus, asserts petitioner, counsel could have damaged the reliability

9    of Chavez's testimony that he in fact saw the man with the bat come out of the passenger side of

10   the car rather than the driver's side of the car and this would have corroborated petitioner's

11   statements that he was not the driver of the car during the robbery.

12        The superior court rejected petitioner's claim stating, "There was nothing establishing

13   that Chavez could not distinguish between the passenger side of the car and the driver's side."

14   (Petition at 51.)

15        In the preliminary hearing, Chavez testified that he lived on Fifth Street and on July 10,

16   2003, observed a small car driving from north to south stop close to the body that was lying in

17   the street.  (CT 25.)  Chavez testified that he saw someone come out of the car on the passenger

18   side who was carrying a bat.  (CT 26-27.)  Chavez saw this man flip the body with the bat, take

19   something from the man lying down, and then went back to the driver of the car and appeared to

20   hand something to the driver.  (CT 28-29.)  After that, the man got into a nearby truck.  (CT 29.)

21   On cross, Chavez testified that he was facing the passenger's side of the car rather than the

22   driver's side.  (CT 37.)

23        At trial, Chavez testified consistently with his preliminary hearing, but gave his street

24   address as 466 South Fifth Street.  (RT 363.)  Respondent concedes that at 466 South Fifth

25   Street, if Chavez saw the car heading from north to south, his point of observation from his

26   window would necessarily be closest to the *driver*'s side of the car rather than the passenger's

27   side, contrary to his testimony.

28        When determining whether counsel's performance was deficient in a claim of ineffective

1    assistance of counsel, this requires showing that counsel made errors so serious that counsel was

2    not functioning as the "counsel" guaranteed by the Sixth Amendment.  See Strickland, 466 U.S.

3    at 687.   The defendant must show that counsel's representation fell below an objective standard

4    of reasonableness.  See id. at 688.  The relevant inquiry is not what defense counsel could have

5    done, but rather whether the choices made by defense counsel were reasonable.  See Babbitt v.

6    Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must

7    be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls

8    within the wide range of reasonable professional assistance.  See Strickland, 466 U.S. at 689.

9         While the court agrees with petitioner that counsel could have cross-examined Chavez to

10   point out to the jury that in fact, according to Chavez's testimony regarding his street address,

11   his point of observation was closest to the driver's side of the car rather than the passenger side

12   of the car when he observed Pineda coming out of the car.  In other words, if Chavez concluded

13   that he saw Pineda come out of the car from the side closest to him and believed that the

14   passenger side was the side closest to him, then counsel's pointing out that the driver's side was

15   actually the side closest to Chavez could have caused doubt in the jury's mind because it was

16   consistent with petitioner's version of the facts.  However, counsel could have thought of this

17   and reasonably decided not to draw attention to this particular inconsistency for fear that it

18   would give Chavez an open opportunity to self-correct and easily explain away his inconsistency

19   by saying that he was mistaken that he was closest to the passenger side yet still insist that he

20   observed petitioner in the driver's seat.  This is so especially in light of Chavez's remaining

21   testimony that he saw the passenger get out with a baseball bat, rifle through the victim's body,

22   watched the passenger exchange words or materials with the person in the driver's seat, and then

23   get into a truck.  While it may be possible to be confused or misstate which side of the car was

24   closest, it is less likely to be believed that Chavez can confuse on which side of a car a driver sits

25   as opposed to a passenger.

26        Presuming as the court must that counsel's conduct was reasonable, the court concludes

27   that counsel's decision not to cross-examine Chavez about this inconsistency was not objectively

28   unreasonable.  See Babbitt, 151 F.3d at 1173.  Taking it one step further and even assuming that

1    the court were to determine that counsel's decision was deficient, in light of the high standards

2    set by the AEDPA, the court could not conclude that the state court's decision was an

3    unreasonable application of <u>Strickland</u>.  <u>Yarborough</u>, 540 U.S. at 5-7 (Ninth Circuit's conclusion

4    that counsel's performance was not only deficient, but that any disagreement with this

5    conclusion would be objectively unreasonable, gives too little deference to state courts who have

6    primary responsibility of supervising defense counsel in state criminal trials).

7              3.      <u>Presentation of evidence</u>

8              Petitioner claims that counsel was ineffective because he failed to present available

9    evidence to corroborate petitioner's version of events.  Specifically, petitioner argues that

10   counsel should have presented a replica of the victim's cell phone and Pineda's cell phone to

11   show that both phones were "flip" phones and therefore petitioner's story that he got the two

12   phones confused was believable.  (Petition at 27.)  Also, petitioner states counsel should have

13   produced the victim's cell phone records to show that petitioner hung up the victim's phone the

14   moment that Pineda's cell phone began to ring, to bolster petitioner's testimony that he was

15   unknowingly using the victim's phone.  (<u>Id.</u> at 27-28.)  Petitioner further claims that counsel

16   should have presented testimony of Erica Haynes who would have testified that she was in

17   possession of petitioner's phone on July 9 and July 10.  (<u>Id.</u> at 28.)  Finally, petitioner states that

18   counsel should have produced the vehicle pursuit report of the officers chasing the red Tacoma

19   to show that the report did not implicate the Mazda.  (<u>Id.</u> at 28-29.)

20             Failure to present probative, noncumulative evidence in support of a chosen defense

21   strategy is deficient performance absent a reasonable tactical justification.  <u>Alcala v. Woodford</u>,

22   334 F.3d 862, 870-71(9th Cir. 2003) (finding deficient performance and prejudice where counsel

23   failed to present most probative evidence in support of alibi defense, including only evidence

24   that established time and date of alibi).  However, none of the items that petitioner claims

25   counsel should have presented were relevant to the contested issues and, therefore, petitioner

26   does not show how he was prejudiced by these omissions.  That petitioner mistakenly believed

27   the victim's phone was Pineda's may demonstrate that he did not intend to use the victim's

28   phone, but it does not show that petitioner was unaware that the victim's property was in the

1   Mazda at the time petitioner drove away from the scene of the crime. Moreover, that a vehicle

2   pursuit report of the officers chasing the red Tacoma and not the Mazda was also irrelevant to

3   the contested issues and would not have changed the result of trial. Accordingly, the state

4   court's decision was not an unreasonable application of Strickland.

5          4.    Pre-trial consultation

6          Petitioner claims that counsel failed to meaningfully consult with him prior to trial.

7   (Petition at 30.) Petitioner asserts that had counsel met with him to discuss Fedele's conditional

8   testimony and Chavez's testimony, petitioner could have pointed out all the evidence he believed

9   was helpful so that counsel could have presented it to the jury. (Id.) Petitioner also argues that

10  counsel should have consulted with him about the evidence found inside the Mazda as well as

11  the cell phone evidence. (Id.)

12         The superior court rejected petitioner's claim stating, "There is nothing showing that

13  [petitioner's] defense attorney was inadequately prepared at trial because he did not meet with

14  petitioner more often." (Petition at 51.)

15         As respondent points out, petitioner was present during Fedele's conditional testimony so

16  counsel's consultation with petitioner about that was unnecessary. Further, as discussed above,

17  counsel was not deficient for deciding not to present such information to the jury. Moreover, for

18  the reasons discussed earlier, the cell phone evidence and evidence found inside the Mazda were

19  not germane to the contested issues at trial. In sum, petitioner fails to demonstrate how counsel

20  performed deficiently in failing to consult with him more and how petitioner was thus prejudiced

21  by it.

22         5.    Cumulative error

23         Petitioner claims that as a result of all his allegations, the cumulative effect of counsel's

24  omissions resulted in ineffective assistance of counsel. In some cases, although no single trial

25  error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

26  still prejudice a defendant so much that his conviction must be overturned. See Alcala v.

27  Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple

28  constitutional errors hindered defendant's efforts to challenge every important element of proof

1  offered by prosecution).  However, where as here, there is no single constitutional error existing,

2  nothing can accumulate to the level of a constitutional violation.  See Mancuso v. Olivarez, 292

3  F.3d 939, 957 (9th Cir. 2002).

4  **CONCLUSION**

5  For the reasons set forth above, the court concludes that petitioner has failed to show a

6  violation of his federal constitutional rights in the underlying state criminal proceedings.

7  Accordingly, the petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

8

9  **CERTIFICATE OF APPEALABILITY**

10  The federal rules governing habeas cases brought by state prisoners have recently been

11  amended to require a district court that denies a habeas petition to grant or deny a certificate of

12  appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

13  foll. § 2254 (effective December 1, 2009).  For the reasons set out in the discussion above,

14  petitioner has not shown "that jurists of reason would find it debatable whether the petition states

15  a valid claim of the denial of a constitutional right [or] that jurists of reason would find it

16  debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel,

17  529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

18  IT IS SO ORDERED.

19  DATED: ____6/29/10____

20  RONALD M. WHYTE
United States District Judge

21

22

23

24

25

26

27

28